MASSENGILL *v.* STATE.

Jan. 19, 1953

No. 38590 16 Adv. S. 40 62 So. 2d 330

280

*Ely B. Mitchell,* for appellant.

*J. T. Patterson,* Assistant Attorney General, for appellee.

ETHRIDGE, J.

Appellant, A. Vivian Massengill, was convicted in January, 1952, in the Circuit Court of Alcorn County of the crime of murder of Leander Massengill, his brother, and was sentenced to life imprisonment in the state penitentiary. On this appeal he argues that the evidence is insufficient to sustain his conviction, that the great weight of the evidence shows that he was insane at the time of the offense and of the trial, that the trial court erred in excluding certain testimony, and that it erred in granting and in refusing certain instructions.

Leander Massengill was killed on April 18, 1951, at a few minutes past nine o'clock in the morning. Leander was operating a tractor and a disk in his field, and John Hosey Fulks, who was working for Leander, was also operating a tractor and disk in the same field. Appellant and Leander were two of a family of six children. After the father and mother died, there appears to have been considerable controversy among the heirs concerning the disposition of the Massengill home place. Ultimately, through a court proceeding, the property was sold to Leander and Ed, two of the sons. The State's evidence shows that the sale resulted in considerable ill feeling by appellant against his brother Leander. Appellant's age is not shown in the record, but he is over fifty years. The testimony of both sides indicated that he was somewhat ''peculiar'' and that he had a hot temper. The State introduced numerous witnesses, neighbors and persons in the community who had known appellant for most of his life, who testified that although he was peculiar at times, appellant was sane and knew the difference between right and wrong.

In September, 1948, appellant was sent to the Mississippi State Hospital at Whitfield for a mental examination, upon the affidavit of two doctors in Alcorn County. On October 6, 1948, he was declared insane by the Chancery Court of Alcorn County, but he was released from the institution at Whitfield within about three weeks thereafter. On March 24, 1949, upon his own petition, he was adjudicated by the chancery court to be of sound mind and competent to transact his own business. But again on November 22, 1949, two local physicians signed an affidavit that appellant in their opinion was insane, and he was again sent to Whitfield for examination. On December 8, 1949, appellant was diagnosed by the psychiatric staff at Whitfield as suffering from a mental condition known as "manic depressive psychosis, depressed phase." However, appellant was again released from Whitfield by that hospital about three months after the latter date. At the time of the shooting, appellant was living alone in a home on thirty acres of land belonging to him, located about a mile and a half by the road south of the field in which Leander was murdered. On the morning of the homicide, appellant was first observed by a State witness, Herman Wren, lying in a plum thicket west of Leander's plowed field with his rifle. Fulks said that Vivian was an expert shot. This field was immediately west of a gravel road running north and south. On the north side of this field was a creek, over which there was a bridge for this road. Three State witnesses testified that, at about 9 a. m., appellant walked north on the road which traversed the east boundary of the field in which Leander and Fulks were plowing; and two said that he stopped at the mail box in front of the home place and looked in it, the mail box being about 868 feet south of the bridge upon which appellant was later standing and which bridge was immediately east of the field which Leander was plowing.

These three witnesses further testified that appellant walked north on this gravel road up to the bridge which was immediately east of the field being plowed, being separated from it only by a ditch; that appellant had in his hand a 22-calibre rifle and that he stood on the southwest corner of the bridge. Fulks, who was plowing the same field, saw appellant standing on the bridge with his rifle, waved to appellant, and then turned his tractor west, going away from appellant. And halfway across the field, 400 yards in depth, Fulks passed Leander in his tractor going in the opposite direction, but he continued to look at Vivian for about halfway across the field. He did not see Leander being shot and did not hear the report of the rifle, because his tractor motor was then being raced. When Fulks looked around within about three minutes, he saw Leander's tractor about forty feet south of the bridge going in a ditch, and Vivian running south on the road toward his home, looking over his shoulder. Leander was killed with one shot in the back of his head. He fell off the tractor on his face in the field.

Herman Wren, appellant's brother-in-law, first saw appellant lying with his rifle in the plum thicket west of the plowed field around 8 a. m. He then saw Vivian going north on the road, saw him stop on the bridge with his rifle, look up the road and out toward the barn. At that point, Wren stepped behind a building to keep Vivian from seeing him. In three or four seconds, he heard a gunshot, which came from the direction where Vivian was on the corner of the bridge. In two or three seconds after the shooting Wren looked back and saw the tractor going in a circle. At that time, Wren was on the south side of a small house several hundred feet south of the bridge.

Appellant's sister, Mrs. Herman (Ethel) Wren, first saw Vivian that morning at the mail box, and then saw him going north on the road about 9 to 9:15 a. m. She

saw Vivian on the bridge, standing there with his rifle held up to his shoulder, and pointing it toward where Leander was working. She then went in the house, and within a few minutes heard the shooting. She then saw Vivian turn and start running at a fast pace south down the road with his rifle in his hand.

Appellant's testimony attempted to establish an alibi. He said that he stayed at home that entire morning, that he slept late, that he was not that day on the road or in the vicinity of the field in which Leander was shot; but that he was at his home about one and one-half miles from the scene. He made an intelligible witness, and his statements of what he was doing that morning, and of prior events in the family's history and other details, appear to be sensible and not the testimony of an insane man. In rebuttal, the State introduced two additional witnesses who had seen appellant on the road in question, within about 200 yards south of the bridge, going north toward it at about 9 a.m. Appellant introduced several witnesses who testified that at times the appellant was ''off,'' and that at times he appeared to be all right; that he had a high temper; that as a patient he was obstreperous, and on one occasion in the hospital attempted to swallow a pillow, and on another occasion was under the delusion that some people were trying to poison him. Defendant also made proof of his being sent to Whitfield on two occasions. The State in rebuttal introduced about eleven witnesses who were neighbors of appellant or who otherwise knew him well, who testified that appellant knew right from wrong; and most of them said that in their opinion they thought he was sane.

 Appellant first argues that the trial court erred in overruling his motion for a continuance on account of the defendant's insanity, and that it erred in finding that defendant was sufficiently sane to go to trial. The trial court heard conflicting testimony somewhat similar to

that outlined above on the principal trial, and found as a fact that appellant was at that time sane and able to go to trial. There was ample proof to support this ruling of the circuit court. The correctness of his ruling is further evidenced by subsequent developments. Appellant, in testifying, made an intelligible witness and indicated in other respects in the details of his testimony that he understood the charge and that he was sane.

 Moreover, the testimony was sufficient to support appellant's conviction. Appellant says that the State's evidence was speculative and did not exclude every reasonable hypothesis of innocence; that none of the witnesses saw him actually shoot Leander or saw Leander fall from his tractor. Although the three witnesses referred to were not eyewitnesses in the sense that they saw the actual shot and Leander fall, they met every other characteristic of an eyewitness. They saw everything except the rifle shoot and Leander fall. The testimony given is in that sense direct and not circumstantial. The only inference the jury needed to make was that under all of these facts, actually seen by the witnesses, they could also reasonably infer beyond a reasonable doubt that appellant was the one who shot the rifle and killed Leander. Moreover, there was strong proof of appellant's resentment toward Leander for buying the home place, and evidence that he had over a year's time made at least three threats against Leander's life, the last one about two weeks before the shooting. Under all of these circumstances, we think that the evidence was ample to support the jury's verdict.

For substantially the same reasons, the issues of whether appellant was insane at the time of the shooting and of the trial were properly questions of fact on conflicting evidence. This issue was amply submitted to the jury in several instructions. They had the opportunity of seeing all the witnesses, and most importantly

of seeing appellant and hearing him testify. The record supports their verdict that he was sane.

■■■ Appellant was originally tried at the July 1951 term of circuit court, which apparently resulted in a mistrial. At the July trial, John Hosey Fulks testified as outlined above. He was plowing in the same field with Leander. Between that date and the January 1952 trial, Fulks died, and at the present trial a transcript of his testimony was introduced, upon the court reporter's verification, and was read to the jury. Lipscomb v. State, 76 Miss. 223, 25 So. 158 (1898). Jodie Boren, a witness for defendant, was then offered to testify that after the first trial he was talking with Fulks about the death of Leander, and that Fulks told Boren ''that he could say three words and put Vib's feet on the ground, and he never told me what the words was. . . .'' This testimony was properly excluded by the trial court. It was hearsay, but if it had been of any material probative value, it might have been admissible to impeach or contradict Fulks. However, the offered testimony of Boren did not show what the three words were which Fulks told him he might say; they and their effect may have been just an opinion of the witness. It was purely speculative and of no material value in contradicting Fulks, even assuming, but not deciding, that he could be contradicted after his death, without a predicate having been laid for it.

■■■ Nor do we find any error in the trial court permitting the State to offer a number of witnesses in rebuttal to the defendant's evidence concerning his alleged insanity. The State's opening case tended to establish defendant's sanity, whereupon the defendant's proof tended to contradict the State's evidence in a number of respects, including additional facts and details brought out by defendant. Hence the State was properly permitted to further rebut and contradict the defendant's evidence on this issue. This testimony was largely in rebuttal of

defendant's testimony. And, moreover, whether to permit such evidence was largely within the discretion of the trial court as a procedural matter. Appellant asked for no right of surrebuttal. All of the testimony went to the jury. We find no prejudicial error in this respect.

The jury was amply instructed on the issues. The State obtained six and appellant eleven instructions. Considering them as a whole, the jury was instructed adequately. ▮ Two of the State's instructions referred to the defendant committing the offense, "at the time he knew that it was morally wrong so to do." We do not approve the use of the phrase "morally wrong" as an element in defining sanity vel non, but those instructions could not have misled the jury, in the light of two instructions granted the State, and one obtained by defendant, which expressly stated the basic requirement that at the time of the shooting appellant must know the difference between right and wrong. Cunningham v. State, 56 Miss. 269, (1879); Brummett v. State, 181 So. 323 (Miss. 1938).

For these reasons, the judgment of conviction must be affirmed. Appellant's attorney, who was appointed by the trial court, is to be commended for the industry and ability with which the defense was presented in the trial court and in the brief and argument on appeal.

Affirmed.

*Roberds, P. J.,* and *Kyle, Holmes* and *Arrington, JJ.,* concur.