WETZEL v. STATE

No. 39355 December 6, 1954 76 So. 2d 188

December 6, 1954 76 So. 2d 194

January 17, 1955

76 So. 2d 846

454

*Neill, Clark & Townsend,* Indianola; *Howard A. Mc-Donnell,* Biloxi, for appellant.

456

*J. P. Coleman, Attorney General; Joe T. Patterson, Asst. Atty. Gen.,* Jackson, for appellee.

Brief for appellant.

458

Brief for appellee.

Brief for appellant.

464

Brief for appellee.

ETHRIDGE, J.

Appellant William Alvin Wetzel was convicted in the Circuit Court of Sunflower County of the murder of Edgar G. (Sonny) McGraw, and was sentenced to death. On this appeal he argues four assignments of error: (1) The State's evidence was insufficient to establish appellant's guilt beyond a reasonable doubt, being inconsistent and contradicted in part by physical facts; (2) the denial of a continuance; (3) the refusal of two instructions requested by appellant; and (4) the cross-examination by the district attorney of six witnesses for appellant concerning prior convictions.

The killing occurred on Tuesday afternoon, April 14, 1953, between 1 and 2 P.M. The scene was a cornfield on the grounds of the Mississippi State Penitentiary at Parchman. The murdered man was Edgar G. (Sonny) McGraw. McGraw, James L. McKnight and Jack Watson were convicted in Pike County of the same offense, grand larceny. McGraw turned "State's evidence" against McKnight and Watson. McKnight pleaded guilty. McGraw received a sentence of two years, and McKnight and Watson considerably longer sentences. On April 13, Monday, McGraw and McKnight were assigned to Camp 5 at the penitentiary, and Watson to Camp 6. McGraw was slain the next afternoon.

The State's case was established by three eye-witnesses to the killing, by another witness who saw Wetzel with the knife immediately after the stabbing, by the testimony of another witness, McKnight, concerning certain threats by Wetzel toward deceased, and other evidence hereinafter referred to.

Andrew Warren, serving a term for cattle theft, was working as a water boy and driving a mule-drawn water cart, on which there were large barrels of drinking water. The cornfield in which the men were working was west of a railroad, and to the west of the cornfield was a 16-foot wide turnrow, uncultivated, upon

which vehicles and farming equipment were turned while working the field. There were seventy-two convicts working the field, in thirty-six rows, two men to a row. Corn was growing in the field, and the men were planting peas or beans between the corn, which apparently was not high. The front man would chop a hole for the seed, and the second man would drop the seed in the hole and cover it. The north row of men was called the lead row, upon which apparently the faster workers were placed. The south row was called the count-row, and the center row the swing-row. Warren's water cart was situated on the north side of the turn-row. He apparently was sitting or standing on the water cart when the cutting occurred. The men from Camp 5 were under the control of a civilian guard named Captain Dye. Under him were four trusty guards called shooters, stationed around the four corners of the working area. On the northwest corner, to the north of the water cart, was E. J. Brooks, a trusty, and on the southwest corner was another trusty-guard or shooter, Jack Brown. The men working the field had started on its west side, gone to the east end, and after turning had almost completed the second row, working west. Most of them were near to the turnrow, and a number were on it. All of the witnesses who saw any part of the event were convicts.

Warren had placed two five-gallon water buckets slightly south of the middle row. He was on his water cart about fifty feet north of the buckets when the killing occurred. He testified that he saw McGraw step out of line to get water, that Jones knocked a hoe out of McGraw's hand, Sorber grabbed McGraw, pulled his head back by the hair, and put his hand over his mouth; that Harrison stood in front of him, and appellant Wetzel ran up behind McGraw, put his hand on his left shoulder, and with a knife cut McGraw's throat. Warren screamed for Captain Dye. McGraw tried to run back to the water cart to the north. War-

ren said he saw Wetzel give the knife to Sorber, but he does not know what Sorber did with it. He said that the cutting occurred about twenty-eight feet south of the water buckets, which would make Warren seventy-eight feet north of where the slaying occurred. McGraw died in about four minutes. The prison physician testified that McGraw's death was caused by the cut, which was about three inches long and two inches deep, on the right side of his neck, extending from the Adam's apple area. McGraw also had a straight, smooth knife wound on the inside of three fingers of his left hand.

James L. McKnight was serving a term for a burglary, along with McGraw and Watson. McKnight had pleaded guilty, but as previously stated McGraw had testified for the State. Watson was in Camp 6. McKnight said that for several days he was in the Hinds County Jail in Jackson with Wetzel and Watson. He heard them talking about McGraw turning State's evidence. Wetzel told him that if McGraw were a "stool pigeon" he would have a hard time at the penitentiary. He heard Wetzel and Watson talking about Jones and Sorber, and he concluded that they had been in jail in Jackson before he got there. When McKnight was assigned to Camp 5 on Monday afternoon, the day before the killing, Wetzel, who knew him, asked him about his and Watson's case and whether McGraw turned State's evidence. McKnight said that he told Wetzel that Watson got thirty years, and McGraw got two years. Wetzel then stated to McKnight that "he told Jack Watson he would take care of Sonny McGraw if he came to the camp where he was." McKnight said that when they got to the field the next morning Captain Dye said that he understood that they had the man who had "squealed", thus calling to the attention of the convicts McGraw's presence. The men returned to their camp about 11 A.M. and went back to work in the field at 1 P.M. McKnight said that he did not see the stabbing, but heard Wetzel say that McGraw "probably

cut his own throat". He had finished his row, had a drink of water, and had sat down south of the stabbing when it occurred. He admitted that he did not like McGraw and at the trial in Magnolia he threatened to kill him with a knife. But he said he was angry at that time and he had no part in the killing.

Another eye-witness was Namon Bangs, serving a term for murder. He said that he saw Wetzel, Jones and Sorber hold McGraw, and Wetzel stab McGraw with a knife. Wetzel handed the knife to Sorber, who buried it in a blue handkerchief. Bangs said that he was about ten feet away when it occurred. Another eye-witness was Jack Brown, a trusty-guard, serving a sentence for murder. He was south of the cutting, looking north toward the water buckets. He testified that he saw Wetzel, Sorber, Jones and Harrison go with McGraw to the water bucket, and then all five men walked south, toward Brown. Jones slapped the hoe out of McGraw's hand, Sorber held McGraw by the hair of his head, with his other hand around in front of him, and Wetzel "caught him on the left shoulder and put his knee in his back, and cut his throat."

Mike Potapov, Jr. did not see the actual cutting, but saw Wetzel with a knife immediately after it happened, and saw Wetzel hand the knife to Sorber, who wrapped it in a blue handkerchief, leaned over like he was tying his shoe, and covered the knife and handkerchief up. He saw Jones, Wetzel, Sorber and Harrison near McGraw. The witness said that he was going to the water bucket when the cutting occurred, and that he was within eight to ten feet of it. Potapov further testified that during the dinner period before the cutting occurred, he was in the camp building or cage in the aisle next to Wetzel; that he saw Wetzel go in a locker under his bed and take out a red-handled jackknife; and that the knife taken by Wetzel was similar to that found buried under the earth on the edge of the turnrow in

a blue and white polka-dotted handkerchief shortly after the killing.

Sgt. D. C. Tomlinson was in charge of Camp 5. He came up after the cutting. He noticed a pile of dirt on the side of a small drain next to the rows, and found under it a blue handkerchief with white polka dots, wrapped around a red jackknife, which Potapov testified was similar to that he had observed Wetzel take from his foot-locker during the noon hour. Tomlinson stated that a record is kept of all incoming packages to the prisoners; that about two weeks before, Sorber's sister in Dayton, Ohio, sent him a package containing four blue handkerchiefs with white polka dots. The handkerchief wrapped around the knife and dug out of the ground by the drain after the killing was similar to the handkerchiefs received by Sorber. On the morning after McGraw's death, Tomlinson said that he found the other three polka-dotted handkerchiefs in Sorber's foot-locker, and that they were similar to the one wrapped around the knife found after the killing. There was no blood on the knife and apparently not on the handkerchief wrapped around it. The witness stated that to his knowledge there were no other similar handkerchiefs at the camp.

Wetzel offered fifteen witnesses for his defense. Dalton testified that Sorber was near him working when McGraw was cut, but he did not know where Wetzel was when the killing took place. He did not think much of a "squealer", and if he knew who killed McGraw, he would not tell the jury. Williams said that he and Sorber were working about forty feet in the cornfield, and Sorber was just behind him. He did not know where Wetzel or Jones were, and did not see the cutting. He stated that after the line came toward the turnrow, Jones crossed the field and talked to Sorber. Jones told Sorber "The kid is ready." Stanley testified that Sorber was in the field working fifteen to twenty-five feet behind him, and he was talking to Sorber when Mc-

Graw cried out. He did not know where Wetzel, Jones and Harrison were. He had no use for a man who turned State's evidence, and if he knew who cut McGraw, he would not tell, since he did not want his throat cut.

Cecil Bear did not see the cutting, but he said that Wetzel at that time was standing next to him at the water bucket, to the north, and was not down where the cutting took place; that Sorber was out in the field working at the time. He denied that after the cutting he poured water on Wetzel's hands. Thomas Butters and Joe Castro did not see the cutting, but said that Wetzel was not where it took place, but was near them at the water bucket. Castro had previously signed a written statement that he did not know where Wetzel, Jones and Sorber were at the time of the killing. Several other witnesses for defendant testified that there were a good many men on the turnrow at the time of the cutting, in addition to Wetzel, Jones, Sorber and Harrison; and that after McGraw was cut he ran north toward the water cart and into several men. Sgt. Tomlinson said that about fourteen men had some blood on them after the cutting.

Appellant is twenty-eight years of age, from Seneca Falls, New York, serving a term for armed robbery. He admitted that for several days he was in the Hinds County Jail in Jackson, and that Watson and McKnight were there also. He does not recall any conversation with McKnight, but admitted that he talked to Watson several times. However, he said that Watson did most of the talking and that he did not say much. He denied that he had told Watson or McKnight that McGraw would have a hard time at Parchman, and that he had stated to Watson that he would take care of McGraw there. He said that he might have discussed McGraw with Watson, because the story was on the radio. Wetzel went to Parchman on March 22, 1953. He had never done farm work before, was tired at night, and did not associate with the other men, including Jones or

Sorber. He stated that McKnight introduced himself, but denied that he had made any threat about McGraw. He denied that he had a knife and that he took a knife out of his foot-locker. He said that when he came out on the turnrow he went to the water bucket. A number of men were there, and he got a dipper and was drinking water when McGraw ran through them with his throat cut, spattering blood on about fourteen people. He got some blood on the front, left side, and back of his pants. He stated that he did not kill McGraw, and did not participate in any killing of him. He did not see the cutting and does not know who did it.

In rebuttal, George Harmon said that he saw Cecil Bear pour water on Wetzel's hands, and Wetzel was rubbing them together. He heard Wetzel state that if McGraw "was a rat, he got just what he deserved and if anybody seen it, it was best that they didn't talk for if they did, they would get just what he did." He admitted on cross-examination that he had previously made a statement to appellant's attorneys that he saw McGraw struggling with Jones, Sorber, Bear and La Fontaine.

*First.* The foregoing is a substantial summary of the testimony. We have carefully considered it. It was ample to support the verdict of the jury. Wetzel's defense consisted of a general denial by him, and an alibi which placed him near the water buckets, about twenty-eight feet north of the killing. At least three of his witnesses and appellant tended to confirm that version. On the other hand, the State offered three witnesses who testified unequivocally that they were eye-witnesses to the killing, and that appellant was the man with the knife who cut McGraw's throat. They were Warren, Bangs and Brown. In addition, Potapov testified that he saw Wetzel with the knife immediately after McGraw's throat was cut, and Wetzel hand it to Sorber, who wrapped it in a handkerchief and buried

it. Cf. Massengill v. State, 216 Miss. 278, 285, 62 So. 2d 330 (1953). McKnight's testimony, as well as other evidence, offered an ample motive, the desire of Wetzel and his accomplices to punish an informer against Watson. A red-handled jackknife wrapped up in a blue and white polka-dotted handkerchief was found near the scene of the killing. Potapov said that during the noon hour he saw Wetzel take out of his locker a similar knife and put it in his pocket. Other State witnesses saw Sorber bury a knife, wrapped in a blue handkerchief with white polka dots. This handkerchief was directly related to Sorber by the testimony of Sgt. Tomlinson. After the cutting Harmon saw Cecil Bear pour water on Wetzel's hands and Wetzel rubbing them together. Jones and Sorber had at least one conversation between them before they got to the turnrow, during which Jones told Sorber "The kid is ready." In the light of all of this testimony, which the jury could, and manifestly did, accept as true, we think that the great weight of the evidence in this case points toward appellant's guilt of this murder. Practically all of the witnesses for both sides were convicts. Although at common law a person convicted of most felonies was disqualified as a witness, Code Sec. 1692 removes that disqualification. The conviction may be used to impeach his credibility, and that is a question for the jury. Code Sec. 1693; 58 Am. Jur., Witnesses, Secs. 137—143.

In all material particulars the State's evidence is consistent and reasonable, and supported by physical facts. It appears that there were a number of other convicts on the turnrow when the killing occurred, but Wetzel and his three accomplices were bunched up together around McGraw about twenty-eight feet south of the water buckets. The delay of several days by Warren and Brown in reporting what they saw was not unusual under the circumstances. Both of these men were convicts, and may very well have feared that they might

receive the same treatment which McGraw did. It is true that there was no blood on the knife discovered by the officers, but either Wetzel or Sorber could very well have wiped it off before burying it. Whether Bangs' testimony or his earlier statement to appellant's attorney should be believed was a question for the jury. The mere fact that John Payne, Chairman of the State Parole Board, participated in the investigation of the crime does not tend to show that the witnesses were offered any hope of reward for testifying for the State. Payne testified that he made no offers of clemency to any of the prisoners. He was an experienced police officer, and the use of that experience in this investigation was not unreasonable. Nor was it unreasonable that McGraw was one of the first men to complete his row and approach the water buckets, since the newer prisoners might well be inclined to work faster than the older ones, or McGraw might have desired to get ahead for his own protection.

The jury was well justified in finding that appellant's motive or reason for killing the deceased was to punish him for informing or "squealing" on his co-indictees, Watson and McKnight. Appellant is a hardened criminal with a long record of crime over many years. The testimony, particularly that by McKnight, certain witnesses for appellant who admitted that they would not disclose the identity of the murderer if they knew him, and J. D. Gibbs, supports the State's contention that appellant killed McGraw because he informed on other criminals. The infantile nature of this attitude in a criminal's mind does not negative its existence.

*Second.* At the beginning of the trial appellant made a motion for a continuance, on the ground that the newspaper publicity about the crime had received such wide notice in Sunflower County as to prejudice the minds of prospective jurors against defend-

ant, so that he could not receive a fair and impartial trial. No motion for a change of venue was made. Ordinarily, popular excitement or prejudice is not a sufficient ground for a continuance in criminal cases in the absence of unusual or extraordinary circumstances. The correct remedy is a change of venue, but a continuance would be proper where unusual circumstances exist. 12 Am. Jur., Continuances, Sec. 18; 17 C. J. S., Continuances, Secs. 75, 78. To support his position, appellant relies upon the special concurring opinion of two judges in Shepherd v. Florida, 341 U. S. 50, 71 S. Ct. 549, 95 L. Ed. 740 (1950). See also Leviton v. U. S., 193 F. 2d 848, 866, certiorari denied, 343 U. S. 946, 72 Sup. Ct. 860 (1952); Palakiko v. Harper, 209 F. 2d 75, 96-98 (CCA 9th 1953). ██ However, the facts in the Shepherd case are in no way analogous to the instant one. Here appellant offered no testimony in support of his motion. He only introduced in evidence two news stories from Indianola and Greenville newspapers, dated September 15, which was six days before the trial began. Those articles are essentially objective newspaper reporting of the approaching trial. They would certainly not cause any prejudice against appellant. The crime was committed on April 14, 1953, and the trial was on September 21, 1953. Apparently all of the material witnesses for both sides testified. The rights of appellant were fully protected. He had a fair and impartial trial. Moreover, the motion for continuance did not comply with the statutory and decisional requirements for such a motion. Assuredly no injustice to appellant resulted from the denial of his motion for continuance. Code of 1942, Sec. 1520. There is no proof whatever in this record of any hostility or prejudice against appellant before or during his trial. Cf. Garner v. State, 202 Miss. 21, 30 So. 2d 413 (1947).

██ *Third.* Appellant complains of the refusal by the trial court of two substantially similar instructions

requested by him. One of them stated: "The Court instructs the jury for the defendant that if you believe from the testimony in this case that any witness who has testified, was actuated by coercion, or fear, promise, or hope of reward, hope of immunity, or pardon, then the testimony of such witness should be weighed by you with great care and caution, and that such testimony should be entirely disregarded, if you believe it to be untrue."

Appellant concedes that there was no direct testimony as to coercion, fear, promise, or hope of reward affecting the testimony of any witness, but he argues that their existence is manifest from the record, and that therefore he was entitled to such instructions. Appellant was granted by the trial court two other instructions which fully submitted this point to the jury. One told the jurors that they should consider the reasonableness or unreasonableness of the testimony, that they were not required to believe the story told by any witness, and that they had the right to consider the motives, demeanor, and background shown in the evidence, and to form their own judgment from what they had heard and seen. Another instruction granted appellant advised the jury that they were the sole judge of the credibility of the witnesses, and they could wholly disregard the testimony of any witness which they did not believe to be true. These granted instructions fully submitted this point to the jury. Moreover, an instruction must be based upon the evidence. ██ █ The requested and refused instructions were erroneous because there was no evidence before the jury tending to establish coercion or hope of reward on the part of any witness, and also because they were on the weight of the evidence. Parnell v. State, 211 Miss. 100, 50 So. 2d 925 (1951); State v. Jennings, 50 So. 2d 352 (Miss. 1951).

██ *Fourth.* Appellant also argues that prejudicial error was committed in the district attorney's cross-

examination of five witnesses for the defendant, and the defendant, concerning former convictions of crimes. Code of 1942, Sec. 1693, permits the examination of a witness concerning his conviction of a crime. This examination must be limited essentially to the identity of the crime and the fact of the conviction. All five of the witnesses for defendant, and the defendant himself, had been convicted on a number of occasions. The case is unusual for that reason. The district attorney's cross-examination, in our opinion, stayed substantially within the limits established by the decisions interpreting Sec. 1693, and was a reasonable cross-examination under the peculiar circumstances here. ██ █ Moreover, appellant made no objection to any of this interrogation, except as to one question asked the defendant, and that objection was promptly sustained by the trial court. Appellant made no motion for a mistrial. So even if there were error in the cross-examination, appellant failed to preserve that point on appeal.

Appellant had a fair and impartial trial. He has been ably represented by counsel both in the trial court and in this Court. On this record his guilt of this murder is clearly shown. The punishment imposed by the jury is the inevitable result of the mandate of the sixth commandment, as codified in our common law and statutes. Hence the judgment of conviction and sentence of the trial court is affirmed.

Affirmed, and Thursday, January 20, 1955, is hereby fixed as the date for the execution of the death sentence in the manner provided by law.

All nine of the judges concur.

McGEHEE, C. J., Specially Concurring.

I am in full accord with the view of all the other judges to the effect that the testimony in this case was ample to justify the verdict of guilty as rendered by the jury, and that the affirmance of the case is justi-

fied and fully warranted by the testimony contained in the record before us; but in fairness to the appellant, Wetzel, I must say that I am doubtful as to whether or not he was the third member of the conspiracy which resulted in the knife-slaying of Edgar G. McGraw in view of other facts and considerations disclosed by the record.

## ON PETITION FOR WRIT OF ERROR CORAM NOBIS

ETHRIDGE, J.

Appellant William Alvin Wetzel, was convicted in the Circuit Court of Sunflower County for the murder of Edgar G. (Sonny) McGraw, and was sentenced to death. He then appealed, and the case was submitted to this Court on November 8, 1954, on briefs and oral arguments by both sides.

While this appeal, which has the same docket number as the instant petition, was under consideration by the Court, appellant Wetzel presented in vacation to the Circuit Judge of Sunflower County a petition for writ of error coram nobis, which charged that he had found certain newly discovered evidence which if known in season would have prevented rendition of the judgment; that certain witnesses for the State had given false and perjured testimony which resulted in his conviction and the State's attorneys knew of it; and that the officials at the Mississippi State Penitentiary, in which appellant was incarcerated for another crime when the killing of McGraw occurred, and the prosecuting attorneys for the State had suppressed and withheld material evidence which would have resulted in a different judgment. On November 17, 1954, the Circuit Judge denied the petition for the writ, and on the same day petitioner Wetzel filed in this Court the same instruments as a petition to this Court for a writ of error coram nobis. This was at a time when petitioner's appeal on the merits was under consideration by the Court.

A decision on the appeal is being handed down this day also. The instant petition was argued orally to the Court in Banc on November 29th by attorneys for the petitioner and the State. In the meantime petitioner, and the State, have filed briefs on the issues, so we consider them both on oral arguments and briefs. We have carefully considered the petition with the two attached affidavits, and have concluded that it should be denied, for reasons hereinafter stated.

The opinion in the appeal from the conviction, which is being handed down this day, substantially summarizes the evidence in the circuit court. Reference is made to that opinion for an analysis and statement of the evidence. On April 14, 1953, petitioner was serving a term in the Mississippi State Penitentiary at Parchman for armed robbery. He and about 71 other men, constituting the inmates at Camp 5 of the penitentiary, were in a cornfield planting peas or beans between the young corn. To the west of the cornfield was a turn-row about 16 feet wide, and in about its approximate center a water boy, Andrew Warren, had placed two large water buckets with dippers, from which the men would drink water as they finished a particular row. The murdered man, Edgar G. (Sonny) McGraw, had been convicted along with McKnight and Watson of the same offense, grand larceny. McGraw had turned "state's evidence" against McKnight and Watson. On Monday afternoon, April 13, 1953, McGraw was assigned to Camp 5 along with McKnight.

The substance of the State's case is that Wetzel, a criminal with several prior convictions, and Sorber, Jones and Harrison decided to kill McGraw because they knew that he was an informer or "squealer". After dinner, between 1 and 2 P.M. on Tuesday afternoon, April 14, 1953, McGraw finished his row, drank some water at the water bucket and Wetzel along with the three accomplices, followed him for about 28 feet south

of the water buckets, at which point Sorber held Mc-Graw and Wetzel cut McGraw's throat with a knife. He then handed the knife to Sorber, who buried it under the ground on the edge of the turn-row, wrapped in a blue polka-dotted handkerchief. The State's case was established by three eyewitnesses, all convicts, who testified that they saw the foregoing happen: Andrew Warren, Namon Bangs and Jack Brown, a convict trusty-guard. Mike Potapov, Jr., another convict, did not see the actual cutting, but he said he saw Wetzel with a knife immediately after it happened, and saw him hand it to Sorber, who buried it in the ground. Potapov also said that during the dinner period before the cutting he saw Wetzel take out of a locker under his bed a red-handled jackknife, which was similar to that found by the guards buried under the earth on the edge of the turn-row in a handkerchief. Another State witness testified that a handkerchief of identically the same description, along with three others, was received in the mail by Sorber about two weeks before the killing. James L. McKnight, a co-indictee of McGraw's, testified that Wetzel had told him that he would take care of McGraw if he came to the camp where he was, because he was a "squealer". George Harmon testified that he saw another convict pouring water on Wetzel's hands, and Wetzel rubbing them together after the cutting. Hence the State's case was supported by strong evidence of considerable probative value if the jury believed the State's witnesses, which it manifestly did.

Appellant's evidence undertook to establish and alibi, to the effect that at the time McGraw was killed he was at the water buckets drinking water, about 28 feet north of where the killing occurred. Appellant and at least three of his witnesses so testified. He denied Potapov's testimony about him having a knife, and denied having made any threats against McGraw.

Wetzel's petition for writ of error coram nobis avers that he is innocent of the murder of McGraw; and

that the testimony of four of the State's witnesses, Warren, Brown, McKnight and Bangs, was false and perjured, and so contradictory as not to warrant a verdict based upon it. The petition further avers that W. R. Dye, referred to as Captain Dye, was the only non-convict in the vicinity of the cutting when it occurred. The record on the merits reflects that Dye was some distance away from the cutting and did not see it, but that he arrived there within a few minutes after having been called by Warren, the water boy. Dye did not testify in the trial below. The instant petition charges that he made an investigation immediately after he arrived at the scene, and that he furnished the results of that investigation to penitentiary officials and the prosecuting attorneys for the State; that the State suppressed his testimony and did not use him as a witness because its attorneys knew that his evidence would have been favorable to petitioner; and that the State's witnesses conspired to use perjured testimony against petitioner in the trial on the merits. The petition avers that after the case was argued on the merits to this Court on November 8, 1954, Dye's statement of what he saw and observed was made known to petitioner and his attorney through a justice of the peace, following which petitioner promptly and with due diligence prepared the two affidavits attached to the petition and filed it. The petition charges that certain members of the prosecution's staff of attorneys knew that Dye's evidence would be in contradiction to the testimony of the State's witnesses, and knew that the testimony of the latter was false, but yet concealed the fact that Dye would testify to establish an alibi for appellant. It is charged that the reason appellant and his attorney did not interrogate Dye before the trial in the circuit court was because they believed that he was hostile toward petitioner. Hence the petition prayed that upon the hearing the judgment of conviction should be reversed and petitioner awarded a new trial.

The only evidence in support of this petition, with the conclusions and averments stated above, is two affidavits, one by W. R. Dye, and another by petitioner Wetzel. Dye's affidavit states that he was employed by the State Penitentiary at Camp 5, and he directed the movement of the convicts out to the field where they were working, and was an overseer of their work; that he was the only civilian employee and non-convict in the vicinity when McGraw was killed. Dye "did not actually witness the fatal altercation which resulted" in McGraw's death. He was then called to the field and he arrived at the place of the killing one to one and a half minutes after the cutting and about two or three minutes before McGraw's death. Dye's affidavit says that he made an investigation of the event, and at that time Warren, Brown, McKnight and Bangs denied to him that they saw who cut McGraw's throat; and that they advised him that there were so many men around the place at the time that it was impossible for them to see it. His affidavit further states that it would have been a physical impossibility for Wetzel to have participated in the cutting, because Dye was about 150 yards away from Wetzel, apparently to the east of him, and that Wetzel was completely out in the cornfield about 30 to 50 yards from the point of the altercation on the turn-row; that while Dye was racing to the scene where McGraw was, Dye passed Wetzel, who was at the time working in the field and who could not have been close enough to the cutting to have participated in it and then have returned to where Dye saw him in the field. Dye's affidavit also says that he furnished the information which he had accumulated in his investigation to Sergeant Tomlinson and A. E. Reed, Assistant Superintendent of the Penitentiary, and they told him that he would probably be called as a State's witness. He was available at all times, but "was never called or questioned" by the officials of the Penitentiary or prosecuting attorneys, and that within a few days after

the killing on April 14th he was discharged from his job for no reason. Dye further states that after he was discharged he was contacted on several occasions by attorneys connected with the prosecution, whose names he could not remember but whom he would recognize if he saw them; that he ''talked'' to them, and perhaps by inference, that he told them of his investigation, but he was never used as a witness; that the testimony of the eye-witnesses for the State is completely contrary to what they told him; and that he would testify to such facts.

Wetzel's affidavit is also attached to the petition. It states that he never had the personal opportunity of communicating with witnesses since about 3 days following McGraw's death, since he was in jail at Clarksdale from that time. The affidavit states that Wetzel believes that some of the convicts and several of the penitentiary officials could have testified to the truth in his behalf, but that he learned that the officials and several of the witnesses had adopted a hostile attitude toward him; that in fact they were intimidated into not testifying; that he did not and could not have participated in McGraw's stabbing because he was not near to it when it occurred. On the question of diligence, Wetzel states that he had reason to believe that Dye was hostile to him and that he and others would convict him; that he discussed all possibilities concerning witnesses with his attorneys during the course of the preparation of his trial, and that both he and his attorneys were diligent in contacting witnesses; that he advised his attorneys that, although some of the officials could testify to help him, they would not, and that it was a vain and useless thing to discuss any of the facts with Dye or any other employee; that he had reason to so think, and for that reason Dye was never contacted, and it was only until several days after the case had been submitted to this Court on November 8,

1954, which was more than a year after his conviction, that he learned of what Dye would testify.

 ██ Although the refusal by the circuit judge to issue the writ is not an appealable action, Carraway v. State, 163 Miss. 639, 141 So. 342 (1932), ██ the Court will consider this petition in Banc in a regular term on its merits, as being addressed to the inherent constitutional powers of the Court in its revisory capacity with reference to a case pending before it, and also as being within the orbit of Code Section 1657. Cf. Ex Parte Willette, 63 So. 2d 52 (Miss. 1953); Dolan v. State, 195 Miss. 154, 13 So. 2d 925 (1943); Musselwhite v. State, 215 Miss. 363, 60 So. 2d 807 (1952); Wheeler v. State, 70 So. 2d 82 (Miss. 1954). ██ Mississippi Laws 1952, Chapter 250, applies only where a petition for a writ of error coram nobis has been filed or sought to be filed after a judgment of conviction has been affirmed by this Court, and accordingly does not apply to the instant case. This is conceded by the State.

 ██ Petitioner contends that on the basis of his petition and the affidavits of Dye and himself, he is entitled to a new trial on the ground of newly discovered evidence. But it is well established both in Mississippi and elsewhere that the writ of error coram nobis can not be invoked for newly discovered evidence going to the merits of the issues tried in the court below. 24 C. J. S., Criminal Law, Sec. 1606, pages 149-150; 49 C. J. S., Judgments, Sec. 312, pages 567-568; 31 Am. Jur., Judgments, Sec. 804; Anno. 33 A. L. R. 84 (1924); Fugate v. State, 85 Miss. 94, 37 So. 554 (1904); Cummins v. State, 144 Miss. 634, 110 So. 206 (1926); White v. State, 159 Miss. 207, 131 So. 96 (1930); Powers v. State, 168 Miss. 541, 548, 553, 151 So. 730 (1933); Buckler v. State, 173 Miss. 350, 356, 161 So. 683 (1935); Roberson v. Quave, 211 Miss. 398, 51 So. 2d 777 (1951); Wheeler v. State, 70 So. 2d 82 (Miss. 1954). The reasons for this well established rule are stated in 31 Am.

Jur., Judgments, Sec. 804, footnote 7: "If the writ of coram nobis were allowed on the ground of newly discovered evidence, after judgment, the defendant might discover or fabricate evidence which would have been material on the trial, that it would be necessary for him only to obtain the writ, assign errors in fact, and proceed to try the whole matter over again, and that such a practice would render the validity of the judgments of the courts too uncertain to comport with sound policy, safety, or public convenience."

■■ Moreover, insofar as the charge is made in the petition that the State's witnesses Warren, Brown, McKnight and Bangs had told Dye shortly after McGraw's death that they did not see who did the killing, and insofar as the petition charges that Dye would testify that Wetzel was out in the field working and about 30 to 50 yards from the cutting, such testimony by Dye would simply be additional evidence on issues thoroughly litigated in the trial court, namely, credibility of the State's witnesses, and the location of Wetzel at the time of the cutting. Dye's testimony, about alleged prior contradictory statements made by the above-stated four witnesses for the State, would simply go to impeach their credibility. It would be an issue of fact for the jury, and their credibility and veracity were thoroughly presented and submitted to the jury. These were important issues in the trial, and they can not now be reexamined at this late date, either by motion or coram nobis. Cummins v. State, supra.

■■ Even where the writ is applicable, it lies only to reverse a judgment for an error of fact not appearing on the face of the record, unknown to the trial court, and which, if known in season, would have prevented rendition of the judgment. Carraway v. State, supra. Certainly testimony by Dye that four of the State's witnesses had made prior contradictory statements to him would not have prevented rendition of the

judgment, but would only have gone to the credibility of those witnesses, an issue tried out in the circuit court.

Another reason why the writ can not issue is that the affidavit of W. R. Dye is completely contrary to the testimony and defense of Wetzel himself and of his corroborating witnesses. Both Wetzel and his alibi witnesses placed him at the water bucket drinking water when the cutting occurred, and therefore 28 feet north of the incident. Petitioner has now filed with the Court an affidavit of W. R. Dye, which states a version entirely different from that of petitioner and his witnesses in the trial. Dye's affidavit places Wetzel ''completely out in the field and a distance of approximately thirty to fifty yards from the point of said altercation . . .'' Moreover, Dye states that Wetzel was working in the field at that point, and that he, Dye, was 150 yards from him, apparently to the east, and that while Dye was ''racing to the scene where McGraw was he passed'' Wetzel working in the field. Dye's affidavit submitted with the petition is so completely inconsistent with the testimony of appellant and that of his witnesses on the trial that it can not be the subject of credence. Petitioner still asserts that he and his witnesses testified truthfully, although the jury did not believe them. That being the case, Dye's affidavit could not in reason and common sense be correct.

Moreover, petitioner admitted on the trial that he got blood on the front, side, and back of his pants, when McGraw ran past him at the water bucket after the cutting. That admission stands wholly uncontradicted. If Dye's affidavit is correct, it was not possible for petitioner to have got this blood upon his clothing; yet he admits that he did. Petitioner's attorney in the arguments suggested that immediately after the cutting Wetzel ran up towards the water bucket, and that this is how he got blood on his pants. However, Dye's affidavit states that he got to the place of the cutting one

to one and a half minutes after it occurred, and that while he was racing to the scene, he passed Wetzel out of the field about 30 to 50 yards away from it. Hence Dye's affidavit wholly contradicts the contention that Wetzel had raced to the water buckets. Moreover, Wetzel testified that he was standing near the water buckets when the cutting occurred. So in brief, Dye's affidavit undertakes to establish an alibi for petitioner which he himself has never asserted, which is wholly in contradiction of the testimony of Wetzel and his witnesses, and which is contradicted by the physical fact of the blood on Wetzel's pants. Under these circumstances, it can not conceivably be thought that if Dye had given this alibi testimony, it would have prevented rendition of the judgment. A reasonable jury could not have accepted Dye's statement of where Wetzel was when the cutting occurred.

██ ██ The other charges asserted in the petition are that the prosecuting attorneys for the State suppressed and withheld material evidence, namely, evidence that the State's witnesses had previously told Dye that they did not see who killed McGraw, and evidence that Dye saw Wetzel working in the field at the time of the cutting; and that the prosecuting attorneys knowingly used perjured testimony. There were four prosecuting attorneys of record representing the State, the district and county attorneys, the state attorney general, and an attorney of Brookhaven. There is no substantial evidence whatever indicated in the two affidavits attached to the petition to support these serious charges. It is manifest that everyone, including appellant and his trial counsel, knew before the trial of this case that W. R. Dye was near the scene when the homicide was committed. Dye states in his affidavit that he did not witness the actual commission of the crime; and that he furnished the information which he had obtained in his investigation of the crime to two attorneys

for the prosecution, whose names he does not remember but whom he would recognize if he saw them, and also to A. E. Reed, Assistant Superintendent of the Penitentiary, and Sergeant Tomlinson. But what was the information which he furnished them? It was that he did not witness the killing; and that shortly after McGraw's death he was told by Warren, Brown, McKnight and Bangs that they did not see the cutting and did not know who did it. However, afterwards these same witnesses manifestly changed their statements and advised the authorities of the facts to which they testified at the trial. If they had made prior contradictory statements, that would simply go to the credibility of these witnesses, and was properly a matter for the defense.

Let us also assume that Dye advised the State's attorneys that he saw Wetzel out in the field 30 to 50 yards from the incident. Prosecuting attorneys must and should exercise their sound discretion and common sense in determining what testimony they shall use in a trial, according to its relevancy, reasonableness and truthfulness. And as stated above, Dye's statement as to where he saw Wetzel was so inconsistent with the entire version of Wetzel and his alibi witnesses, and with the testimony of all of the State's witnesses, and with the fact that Wetzel had blood on his trousers after the cutting, that the State's attorneys were fully warranted in not attributing any weight to this information which we will assume Dye gave to them. The State's attorneys necessarily used their reason and common sense in determining whether the witnesses for the State were telling the truth, or whether Dye, who was not an eyewitness, had given them a correct version. And no doubt his many inconsistencies and improbabilities were considered by them. So the affidavits and the petition fail to furnish any support for the charges that the State's attorneys knowingly used perjured testimony, and that they suppressed and withheld material evidence.

■ ■ There is another good and sufficient reason why this petition for writ of error coram nobis should be denied. The hereinafter stated principle is applicable as a matter of sound judicial procedure in the administration of justice, whether we consider the petition as one for a writ of error coram nobis, or simply a petition or motion to call the additional evidence to the attention of the Court. Buckler v. State, supra; Musselwhite v. State, supra. It is stated in 31 Am. Jur., Judgments, Section 806: "It is essential to the availability of the remedy of coram nobis or coram vobis that the mistake of fact relied upon for relief was unknown to the applicant at the time of the trial, and could not by the exercise of reasonable diligence have been discovered by him in time to have been presented to the court, unless he was prevented from so doing by duress, fear, or other sufficient cause, so that it was by no negligence or other fault of his that the matter was not made to appear at the former trial."

■ ■ Petitioner's affidavit admits that he went over with his attorneys before the trial the names of all possible witnesses and "discussed all possibilities concerning witnesses and their testimony"; that the reason that W. R. Dye was never contacted, although he was available, was that Wetzel advised his attorneys "that it was a vain and useless thing to discuss any of the facts with Captain Dye . . . ", because he believed that Dye was hostile toward him. We think that it was the duty of petitioner and his counsel to ascertain whether Dye would testify favorably for him, and if he would, to use him as a witness. That requirement of reasonable diligence, applicable to any kind of sound judicial procedure, and particularly so to a petition of this sort, is not met by petitioner with reference to W. R. Dye.

For the foregoing reasons, Wetzel's petition for a writ of error coram nobis is hereby denied.

Petition for writ of error coram nobis denied.

All nine of the judges concur.

## ON APPLICATION FOR LEAVE TO FILE
## PETITION FOR WRIT OF ERROR CORAM NOBIS

LEE, J.

On December 6, 1954 this Court affirmed William A. Wetzel's conviction of murder and death sentence. 76 So. 2d 188. On the same day his petition for a writ of error coram nobis was denied. 76 So. 2d 194. January 20, 1955 was fixed as the date for execution of the death sentence. On January 12, 1955 Wetzel filed a petition, which he designates as "Application for Leave to File Petition for Writ of Error Coram Nobis."

This petition is filed under Chapter 250, Miss. Laws 1952. In brief, that statute provides that in all criminal cases where a judgment of conviction has been affirmed on appeal, "no petition for the writ of error coram nobis shall be allowed to be filed or entertained in the trial court unless and until the petition for the writ shall have first been presented" to this Court, and "an order granted allowing the filing of such petition in the trial court." Chapter 250 provides for three days written notice to be served on the Attorney General, but that the same may be waived. The Attorney General has waived that three-day notice.

Chapter 250 establishes a procedure before this Court which is a condition precedent to filing a petition for writ of error coram nobis in the trial court in criminal cases after conviction has been affirmed. The Mississippi Constitution of 1890, Section 146, designates this Court an appellate court. We have no facilities for hearing extensive oral testimony. The established practice is that applications of this sort and motions should have attached to them supporting affidavits concerning the facts charged in the pleading. ██ ██ The application

for leave to file the petition for writ in the circuit court has no affidavits attached. With one minor exception hereinafter referred to, it raises the same questions which were presented to this Court, and decided by it in the first petition for writ of error coram nobis dealt with in 76 So. 2d 194. The decision there is res judicata of the averments and matters raised in the present application, which asks us to authorize the trial court to consider again the same issues already decided in 76 So. 2d 194. If such a hearing were had in the trial court, the circuit court would necessarily have to consider that the law of the case is established by the decision of December 6, 1954, and that it is res judicata of the instant application and of the proposed petition for the writ.

The only additional fact alleged in this application is that Robert James, an ex-convict, was confined in Camp 5 at the State Penitentiary when McGraw was killed; that James has made the statement that he was standing immediately beside Wetzel at the time of the cutting, and that Wetzel had no part in the slaying; that James can be brought into court as a witness to so testify; and that his testimony was not known to petitioner during the trial, nor until January 12, 1955. If James' testimony should be considered, it would be merely cumulative for Wetzel on an issue litigated in his trial on the merits. Wetzel and several other witnesses testified that he was not at the point where the cutting occurred, but that he was at the water buckets. Several eye-witnesses for the State testified to the contrary, and the jury, trier of facts, found against defendant. The application does not state where James would say that Wetzel was when the cutting occurred, but only states that he would say that he was standing immediately beside Wetzel. Since Wetzel and his witnesses claim that he was at the water buckets, presumably James would testify to the same effect. This would simply be cumulative testimony for Wetzel on an issue of fact already

submitted to and decided by the jury. Moreover, it is newly discovered evidence, and the writ cannot be invoked for that purpose. 76 So. 2d 194, 198.

The administration of justice must accord to every man a deliberate, reasoned, and impartial trial and judgment. Wetzel has received that. Petitioner has been represented by able cousel both in the trial court and this Court. He received a fair and impartial trial before a jury. Their verdict is amply supported by the evidence. Before the judgment of the circuit court was affirmed, he filed in the trial court, and later in this Court, a petition for a writ of error coram nobis, setting up the same alleged facts and issues raised in the instant application. That petition was thoroughly considered by both courts and was denied. 76 So. 2d 194. He now seeks a 60-day stay of execution and permission to file another petition for writ of error coram nobis. Although the procedure under the first petition for the writ in 76 So. 2d 194, and the procedure in an application for permission to file a petition for the writ under Chapter 250, Laws of 1952, are slightly different, the substantive aspects of both are substantially the same.

The decision of December 6, 1954 is res judicata of the issues raised here by petitioner for the second time.

The application for leave to file a petition for writ of error coram nobis and for a 60-day stay of execution is denied.

All Justices concur.

ON MOTION TO STRIKE AND EXPUNGE FROM THE RECORD A PART OF STATE'S REPLY BRIEF AND THE AFFIDAVITS ATTACHED THERETO.

March 21, 1955 78 So. 2d 774

Per Curiam.

On December 6, 1954, as shown in 76 So. 2d 188, this Court in the above styled cause, affirmed the judgment

of conviction and sentence of death rendered by the trial court against William A. Wetzel for the murder of Edgar G. (Sonny) McGraw. On that same day we denied the petition of the appellant for a writ of error coram nobis, which was filed pending the consideration of the appeal of the case on its merits. 76 So. 2d 194.

In this first petition, filed before the affirmance of the case on its merits as aforesaid, it was alleged that some of the prosecuting attorneys had knowingly suppressed testimony during the trial of Wetzel before a jury that would have been favorable to him, and also used perjured testimony against him. That petition was supported by an affidavit of one Captain W. R. Dye and the affidavit of the appellant, William A. Wetzel.

The district attorney of the district wherein the case was tried, the county attorney of the county from which the appeal was taken, the Attorney General of the State of Mississippi, and the district attorney from the district from which the victim of the homicide, Edgar G. (Sonny) McGraw, had been sent to the state penitentiary, all participated in the prosecution. The affiant, W. R. Dye, who made the specific charges in his affidavit, stated therein that he was unable to give the names of the two prosecuting attorneys, who, he was alleging, had been guilty of this alleged offense. No counter-affidavits were filed in that proceeding, presumably for the reason that no particular prosecuting attorney had been named as being guilty of this alleged offense.

After the conviction and death sentence was affirmed by this Court on December 6, 1954, the appellant Wetzel filed another petition on January 12, 1955 under Chapter 250, Miss. Laws 1952, designated as "Application for Leave to File Petition for Writ of Error Coram Nobis." This statute establishes the procedure to be followed in seeking a writ of error coram nobis after affirmance by this Court on appeal. The decision of this Court on the second petition is reported in 76 So. 2d 846, and our

opinion states that this decision "raises the same questions which were presented to this court, and decided by it in the first petition for a writ of error coram nobis dealt with in 76 So. 2d 194" with one minor exception to the effect that one Robert James, a fellow convict in the state penitentiary, would testify in support of the appellant's defense if he was granted a new trial. The decision on the second petition was rendered on January 17, 1955.

When the second application for leave to file a petition for a writ of error coram nobis was filed on January 12, 1955, the date for the execution of the death sentence had been fixed for January 20, 1955, as shown by the concluding paragraph of the opinion affirming the conviction of murder, reported in 76 So. 2d 188. The attorney now representing the appellant Wetzel was on January 12, 1955, engaged in the performance of his duties as a member of the State Senate while the Legislature was then in session. He was to return to his home in Biloxi, Mississippi, on Thursday afternoon of January 13, 1955, in order that he might spend Friday and Saturday in the preparation of a case which was set for trial in the Federal District Court at Biloxi, Mississippi, on the following Monday, the City of Biloxi being located approximately 185 to 195 miles from the City of Jackson, Mississippi.

In view of the above stated plight of the appellant's attorney, he requested that the Court act on this second petition immediately because thereof in order that if the same was denied he might prepare the necessary papers for an appeal to the Supreme Court of the United States before leaving Jackson on Thursday afternoon, January 13, 1955. A conference of all nine of the justices was called by the Chief Justice on either January 12th or the morning of January 13, 1955, when it was decided that this second petition should be denied for the reasons stated by the Court in its opinions reported in 76 So. 2d

194 and 76 So. 2d 846. The Chief Justice was authorized by the conference to notify appellant's attorney that this action had been taken and that an opinion would be prepared to that effect and would be rendered from the bench in open court on Monday morning of January 17th, at 9:30 o'clock, the Attorney General's office having waived three days' notice required to be given to that office prior to the consideration of this second petition.

Pursuant to the verbal notice given to appellant's attorney of the decision arrived at by the conference of all the justices, he prepared and left with the Chief Justice, before leaving for Biloxi, a petition for an appeal to the Supreme Court of the United States *in forma pauperis,* supported by the affidavit of the prisoner Wetzel at the state penitentiary, made on January 11, 1955, as to his inability to proceed except in that manner, together with an order to be signed by the Chief Justice granting such appeal *in forma pauperis* and staying the execution of the death sentence pending the outcome of the appeal to the Supreme Court of the United States. The Chief Justice held these papers in connection with the proposed appeal to the Supreme Court of the United States until the following Monday, January 17, 1955, since he deemed it necessary that he do so, awaiting the handing down of the opinion on Monday, January 17, 1955, disposing of this second petition for leave to file a petition for the writ of error coram nobis. On January 17, 1955, at 12:25 p. m., the Chief Justice had the petition for the appeal to the United States Supreme Court, the affidavit of the appellant Wetzel as to his inability to proceed other than *in forma pauperis,* and the order granting such appeal and the stay of execution of the death sentence, marked filed by the clerk of this Court, after the opinion of this Court on the second petition for leave to file a petition for a writ of error coram nobis had been rendered by the Court and filed with the clerk at 9:30 a. m. The order granting the appeal *in forma*

*pauperis* and the stay of execution of the death sentence was signed by the Chief Justice on Monday, January 17, 1955, at 12:25 p. m. after the petition for the appeal and the affidavit of the appellant were marked filed by the clerk.

It is alleged in the motion of the appellant now before us seeking to strike a part of the State's reply brief and the counter-affidavits of the prosecuting attorneys, which were not filed until Saturday, January 15th, before the decision on the second petition was rendered on Monday, January 17, 1955, that the procedure followed in this matter "is not only highly irregular and unheard of, but unprecedented * * *." It is to be conceded that our procedure may have been highly irregular and perhaps unprecedented, but, as hereinbefore stated, the manner of handling this second petition was due to a desire on the part of this Court to accomodate the defense attorney and afford him the opportunity of completing his work in connection with the preparation of the appeal to the Supreme Court of the United States before he became engaged in the trial of an important case in the federal court at Biloxi, Mississippi, on January 17, 1955, three days prior to the date fixed for the execution of the death sentence of his client. The Court was of the opinion that since this attorney was then serving as a State Senator at a session of the Legislature and would perhaps be too busily engaged during the following week in the trial of the federal court case at Biloxi, Mississippi, to then perfect his appeal to the United States Supreme Court, he should be shown this consideration in order that his appeal might be perfected, so far as the preparation of the necessary papers in connection with such an appeal was concerned, before he left Jackson on Thursday afternoon of January 13, 1955, in order that his client might not be executed on January 20th, without his having the opportunity of perfecting the appeal between January 17th and that date.

The State has filed, through an Assistant Attorney General, Joe T. Patterson, a response to the motion to strike a part of the State's reply brief and the counter-affidavits hereinbefore mentioned and he states in such response that when the Attorney General's office agreed to sign the waiver of the three days' notice required, before this second petition for leave to file a petition for a writ of error coram nobis could be considered, that he informed the appellant's attorney that in signing such waiver the Attorney General's office did not waive the right to file an answer to his petition. In promptly acting upon this application for leave to file the second petition for a writ of error coram nobis, the Attorney General's office was not afforded sufficient time to obtain the counter-affidavit from three of the prosecuting attorneys prior to Saturday, January 15, 1955, since they lived in other parts of the State than the City of Jackson; but since they were on file before the decision on the petition was actually rendered from the bench, this Court is of the opinion that the motion to strike a part of the State's reply brief and the counter-affidavits should not be sustained.

Final decisions of this Court are rendered in open court on Mondays at 9:30 a. m., and any member of the Court may have a decision removed from the list at any time up to 9:30 a. m. on Monday, if he desires a further conference in regard to the decision before the same shall become final. Moreover, it is not customary to advise an attorney in a case of the decision reached by the justices in conference except at the time when the decision is announced from the bench in open court. Therefore, since the procedure followed in the instant case was for the accomodation of appellant's attorney for the reason hereinbefore stated, the Court is of the opinion that the appellant is in no position to complain about the State's reply brief and counter-affidavits being filed between the time his attorney was advised of

the decision reached in conference on his second petition and the date when the decision thereon was rendered from the bench. For the reasons stated in our former opinions heretofore rendered in this matter, the filing of the State's reply brief and counter-affidavits was not deemed essential to our decision on either the first or second application for the writ of error coram nobis, since the Court was of the opinion that the petitioner had not presented a case which entitled him to the issuance of the writ.

The motion now before us must therefore be overruled.

All Justices concur.

## ON MOTION TO SET NEW EXECUTION DATE

January 9, 1956 84 So. 2d 429

HALL, J.

The appellant was convicted of the crime of murder in the Circuit Court of Sunflower County, Mississippi, and upon appeal to this Court the judgment of the trial court was affirmed on December 6, 1954, and the date of execution was fixed for January 20, 1955. Wetzel v. State, 76 So. 2d 188. Thereafter a petition for writ of error coram nobis was denied. Wetzel v. State, 76 So. 2d 194. Appelant prosecuted an appeal to the Supreme Court of the United States, which Court on October 24, 1955, dismissed the said appeal. Thereafterwards appellant filed a motion in the Supreme Court of the United States for leave to file a petition for a rehearing, and on December 5, 1955, said court entered an order denying the said motion and the cause has been remanded to this Court for further proceedings.

The date for execution formerly set by this Court having passed, the State has filed a motion to have another date fixed for execution of the death sentence upon appellant. The said motion is hereby sustained and

Thursday, February 9, 1956, is hereby set for the date of appellant's execution.

All Justices concur.

ON MOTION TO SET NEW EXECUTION DATE

January 7, 1957 91 So. 2d 750

LEE, J.

In the Circuit Court of Sunflower County, William Alvin Wetzel was convicted of murder and was sentenced to suffer the death penalty. He prosecuted an appeal to this Court and the sentence and judgment were affirmed on December 6, 1954, with Thursday, January 20, 1955, set as date of execution of the death penalty. (Miss.) 76 So. 2d 188. On the same date, his petition for writ of error coram nobis was also denied. (Miss.) 76 So. 2d 194. He appealed to the Supreme Court of the United States, and on October 24, 1955, in cause No. 48 Misc. at the October Term thereof, that court dismissed his appeal and on December 6, 1955, denied his motion for leave to file a petition for rehearing. Thereafter this Court, after his appeal had been dismissed by the Supreme Court of the United States, set Thursday, February 9, 1956, as the date for the execution of the sentence. (Miss.) 84 So. 2d 429. On January 28, 1956, this Court advanced his appeal from an order of the Circuit Court of Sunflower County, dismissing his petition for a writ of habeas corpus. (Miss.) 84 So. 2d 795. On February 6, 1956, this Court affirmed that judgment. (Miss.) 85 So. 2d 469. His petition for certiorari to the Supreme Court of the United States, in cause No. 102 Misc. at the October Term thereof, was denied on October 8, 1956, and his petition for rehearing thereon was denied on November 19, 1956. Copies of these orders are now on file in this Court.

The Attorney General of the State has filed a motion, calling attention to the foregoing facts, and suggesting

that this Court now fix a new date for the execution of the sentence. Service has been made in accordance with the rules.

The motion is sustained; and Thursday, February 7, 1957, is hereby fixed as the date for execution of the death sentence in the manner provided by law.

All Justices concur, except *McGehee, C. J.*, who declined to take any part.