MUSSELWHITE *v.* STATE.

Nov. 10, 1952

No. 38051          7 Adv. S. 15          60 So. 2d 807

*Kelly Hammond* and *Henry E. Pope,* for appellant, filed the following memorandum of authorities:

*J. T. Patterson,* Assistant Attorney General, for appellee.

ALEXANDER, J.

Appellant, by next friend, filed a petition for a stay of execution alleging the insanity of the petitioner occurring after judgment of conviction of murder and the sentence of the court imposing the death penalty. 54 So. 2d 911 (Miss.). Upon a hearing before the trial judge, it was found that the petitioner was insane but he limited the stay of execution in the nature of a supersedeas only pending appeal.

At the outset, we avoid any discussion as to the exact procedure here followed. Such view dispenses with the necessity for adjudging the propriety of the form in which it was cast. Carraway v. State, 163 Miss. 639, 644, 141 So. 342. **(Hn 1)** Where the issue involves due process, technical perfection of pleading must not be required and intricate niceties may not be allowed to control. Brown v. State, 196 Miss. 316, 17 So. 2d 801.

The record testimony amply supports the finding of post-trial insanity. In fact, there is no dispute or contradiction on this point. The only point of difference in the testimony of qualified expert physicians is whether the condition is the result of an overpowering sense of fear engendered by the pendency of his execution. All these witnesses agree that his condition is properly to be diagnosed as schizophrenia, catatonic type. The evidence is preponderant that this condition, while subject to aggravation by the stress of anticipated dissolution, is more deep seated and is the maturing of a progressive mental deterioration.

We are compelled under this record to accept the finding that petitioner is insane and to disregard the divergent views as to its cause. We must deal with a condition and not a theory. While the testimony upon this issue need not be here recited, there is agreement among the examining physicians that at the time of the hearing the petitioner had lost awareness of his precarious situation.´ Amid the darkened mists of mental collapse, there is no light against which the shadows of death may be cast. It is revealed that if he were taken to the electric chair, he would not quail or take account of its significance. There is reaction neither to audible nor physical stimuli. He takes no nourishment voluntarily and responds to neither command nor entreaty. All suspicion that his symptoms or conduct are feigned is allayed by an expert consensus that there is no malingering.

We accept therefore the finding that the petitioner is insane and that such insanity has befallen him since his conviction nearly two years ago. We are therefore confronted with the question whether his execution should be stayed.

The right of the sovereign to execute one who is insane has always been denied at least since the repeal of the Statute, 33 Henry VIII, c. 20. The present humane view is thus expressed by Blackstone: ''If a man in his sound memory commits a capital offense, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defence? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of non-sane memory, execution shall be stayed: for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or

execution." Cooley on Blackstone, Book IV, p. 24. It had previously been thus expressed by Sir Edward Coke: "the execution of an offender is for example, *ut poena ad paucos, metus ad omnes perveniat* (that the punishment may reach the few, but the fear of it affect all): but so it is not when a madman is executed; but should be a miserable spectacle, both against law, and of extreme inhumanity and cruelty, and can be no example to others." 3 Inst. 6. A later rendering of this view is found in 1 Hawkins, Pleas of the Crown 2:

"As to the first point it is to be observed that those who are under a natural disability of distinguishing between good and evil, as infants under the age of discretion, idiots and lunatics, are not punishable by any criminal prosecution whatever.

. . . . . .

(Hn 2) "And it seems agreed at this day that if one who has committed a capital offense becomes non compos before conviction, he shall not be arraigned; and if after conviction, that he shall not be executed."

It has been stated that no state in the Union supports the notion that an insane man may be executed. See tabulation in the dissenting opinion of Justice Frankfurter in Solesbee v. Balkcom, 70 S. Ct. 457, 462. We have so intimated in Howie v. State, 121 Miss. 197, 222, 83 So. 158; Sinclair v. State, 161 Miss. 142, 132 So. 181; Mitchell v. State, 179 Miss. 814, 826, 176 So. 743; Lewis v. State, 155 Miss. 810, 125 So. 419. Surely if a lunatic may not have punitive damages assessed against his property in a civil case, (Feld v. Borodofski, 87 Miss. 727, 40 So. 816) he may not in a criminal case suffer execution against his life. For a full discussion, see State, ex rel Alfani v. Superior Court, 139 Wash. 125, 245 Pac. 929, and annotation 49 A. L. R. at p. 804. We pursue no farther the legal and humane bases for this conclusion except to add that this public policy is recognized in Code 1942, Section 2558.

It is contended by the State that the procedure to be followed is that prescribed by Code 1942, Section 2558, which is as follows: ''If the sheriff shall, at any time, be satisfied that any convict in his custody under sentence of death is insane, or that any female convict under like sentence is pregnant, he shall with concurrence of the judge of the circuit court, or of the chancellor, or the president of the board of supervisors in the absence of the circuit judge, summons six physicians if to be had, and if not, other discreet and experienced freeholders and electors of said county, to make up an inquest to inquire into such insanity or pregnancy, as the case may be. The sheriff shall summons and swear all necessary witnesses and the jury and sheriff after full examination shall certify under their hand what the truth may be in relation to the alleged insanity or pregnancy, and in case such convict shall be found insane or pregnant, the sheriff shall immediately transmit the verdict of the jury to the governor and suspend execution of the sentence until the governor shall be satisfied of the sanity of said convict, or that the convict is not or is no longer pregnant. In case such convict shall be found insane, the sheriff shall immediately transmit and deliver said convict to the state insane asylum, and a copy of the verdict of the jury and sheriff which made up an inquest to inquire into the sanity of said convict shall be sufficient authority for the superintendent of the state insane asylum to receive said convict as an inmate of said institution, and when the superintendent of the insane asylum so certifies to the governor that he is satisfied of the sanity of the convict, and the governor is so satisfied of the sanity of the convict, the governor shall order the sheriff to return said convict to the county where the crime was committed, and shall order, by his warrant to the sheriff, the execution of the convict on a day to be therein appointed by the governor according to the sentence and judgment of the court.''

It is conceded that the statute was not followed literally. On July 20, 1951, pending the appeal of the case upon its merits, petitioner was transferred to the Mississippi State Hospital on order of the trial judge. On November 27, 1951, after affirmance of the judgment of conviction, a stay of execution was granted by the Governor. On September 25, 1952, petitioner was transferred, upon order of the trial judge, to the Hinds County jail; on September 30, 1952, the Governor issued an executive order under Section 2558 setting the date of execution as October 31; the order reciting that the petitioner was then sane; and on October 6, 1952, the trial judge ordered petitioner to be returned to said hospital for examination as to his sanity.

(Hn 3) The contention is that Section 2558 is the exclusive remedy under this situation. With this view we do not agree. Lewis v. State, supra. The procedure therein outlined is but a legislative device whereby facts may be authenticated to the Governor as a basis for the exercise of executive clemency. We do not hold, but are free to express grave doubt, whether an appeal may be allowed from such finding of a Governor. It is not a judicial act, but rather a matter of clemency or grace. It is not controlled by rules of law, and such power is to be exercised under the compulsions of an innate sense of justice defined in the conscience and emotions of the executive.

(Hn 4) Due process, however, requires more than the mere fact of some hearing. The phrase belongs in the category of judicial action whose functions are exercised in the light of established procedures, of which the indictment is the first act in the judicial drama and the execution is the last and to the accused the most important. The act of the executive is therefore not res judicata because it is not judicial. See Spann v. State, 47 Ga. 549. Prohibition against cruel and unusual punishment is a constitutional declaration which controls the final act of which the preceding stages of the trial are integral parts.

It is a function of due process that an accused may have occasion intelligently to show cause why the sentence of death should not be pronounced upon him. The death warrant itself is a part of the judicial process. It is likewise part of due process that there be available to him as a rational person avenues toward executive clemency, or even spiritual consolation. 14 Am. Jur., Criminal Law, Section 49. As stated in Blackstone's Commentaries 388: "Another cause of regular reprieve is, if the offender become *non compos* . . . after judgment, he shall not be ordered for execution: for '*furiosus solo furore punitur,*' and the law knows not but he might have offered some reason, if in his senses, to have stayed these respective proceedings." **(Hn 5)** Due process "involves the application of standards of fairness and justice very broadly conceived. They are not the application of merely personal standards but the impersonal standards of society which alone judges, as the organs of Law, are empowered to enforce." Louisiana v. Resweber, 329 U. S. 459, 91 L. Ed. 422, 430, (concurring opinion.)

If the natural death of the body of one condemned may stay the hand of the executioner, it must follow in reason and justice that the death of the mind should have like effect. For it may well be questioned whether the petitioner is the same as he who was convicted. It was a criminal intent, resident in a sane mind, which justified his conviction. Without it there could have been no guilt. It was thus that a sane mind worked forfeiture of the body and its life. Must it be less reasonable or relevant that a lost mind may redeem the body from death at the hands of the State? A consideration of these matters is always appropriate in adjudging whether there has been due process. Phyle v. Duffy, 334 U. S. 431, 92 L. Ed. 1494.

**(Hn 6)** The petition, directed to an inquiry into the mental condition of petitioner, was properly presented to the judge before whom he had been tried and whose judgment

and sentence, although affirmed by this Court, remains his own. **(Hn 7)** His finding of fact that the petitioner is insane is, as stated, found to be supported by the record. In order to implement this finding and to arrive at consistency, we must reverse that part of the order which limited the stay of execution to the period pending the appeal.

We are not disturbed by intimations that a ready means is thus made available to all who, in similar circumstances, might affect insanity. If evils be thus forecast, they must remain sufficient unto their day. We deal alone with the case before us. We declare immunity to any clamor of vengeance or to the moving recitals of a brutal murder heretofore adjudged and condemned. We are content to stand upon ground higher than the common urge of outraged reprisal which revives the *lex talionis,* demanding a life for a life. Our grasp must tighten upon those principles which antedate our statutes and which enlightened discernment can read between their lines. A forthright acceptance of these products of an intuitive sense of justice should quell the mutiny of little minds, tilted with revenge, which mock the majesty of the law and taunt it with defiance of concepts which boast no parentage save that of natural law. Our immediate concern now rises above the individual and encompasses neither castigation of one declared a murderer nor sympathy for one who, despite his having been scathed by the ordeal of trial, now rests mute and deranged within the chamber of death. It is not personalities but principles that must persuade us. There are times when law and justice are themselves on trial. As custodians of the same system which found his barbarous act against the peace and dignity of the state, we must remain alert to uphold that dignity, and by refusing to turn the law upon itself, preserve its majesty.

The cause will be reversed and remanded with direction to stay the execution of petitioner until such time

as he may properly be adjudged to have regained his sanity.

Reversed and remanded.

All Justices concur except *Hall, J.,* who took no part.