752 F.2d 526
 Alvin Bernard FORD, or Connie Ford, individually and acting
as next friend on behalf of Alvin Bernard Ford,
Petitioners-Appellants,
v.
Louie L. WAINWRIGHT, Secretary, Department of Corrections,
State of Florida, Respondent-Appellee.
 No. 84-5372.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 17, 1985.
 
 Richard H. Burr, Public Defender, 15th Judicial Circuit of Fla., Richard L. Jorandby, Asst. Federal Public Defender, West Palm Beach, Fla., Laurin A. Wollan, Jr., Tallahassee, Fla., for petitioners-appellants.
 Jim Smith, Atty. Gen., State of Florida, Joy Shearer, Russell Bohn, Penny H. Brill, Asst. Attys. Gen., West Palm Beach, Fla., for respondent-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before VANCE and CLARK, Circuit Judges, and STAFFORD*, District Judge.
 PER CURIAM:
 
 
 1
 Over ten years ago, on July 21, 1974, Alvin Bernard Ford murdered a helpless, wounded police officer by shooting him in the back of the head at close range. Ford was captured, tried in state court and sentenced to death. The history of these events and the various steps in the judicial proceedings that followed are set forth in more detail in our original panel opinion, Ford v. Strickland, 676 F.2d 434 (11th Cir.1982), and in our 1983 en banc opinion, Ford v. Strickland, 696 F.2d 804 (11th Cir.) (en banc), cert. denied, --- U.S. ----, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).
 
 
 2
 The 1983 en banc opinion affirmed the district court's denial of Ford's habeas petition but remanded for a determination of the possible effect on this case of Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), which was then pending in the Supreme Court. That determination resulted in the district court's dismissal of Ford's petition on March 22, 1984. Ford's merits appeal and all collateral attacks to that point had been concluded with results unfavorable to him.
 
 
 3
 Before resolution of his first federal habeas procedure Ford invoked the procedures of Fla.Stat. Sec. 922.07 (1983). The Florida governor appointed a commission of three psychiatrists to evaluate Ford's current sanity in light of the appropriate statutory standards. The commission members reported their findings and on April 30, 1984, the governor signed a death warrant setting Ford's execution for the week beginning at noon Friday, May 25, 1984.
 
 
 4
 Ford's mother, as next friend, then filed a motion in state trial court requesting a stay of execution, a hearing and court appointment of experts to determine Ford's competency to be executed. The motion was denied summarily. After hearing oral argument, the Florida supreme court also denied relief. Ford v. Wainwright, 451 So.2d 471 (Fla.1984). The present petition was filed in district court on May 25, 1984. The district court held a hearing on May 29, 1984, heard argument of counsel and concluded the hearing by denying Ford's petition on the alternative grounds of abuse of the writ[1] and the merits. On May 30, 1984, a divided panel of this court granted Ford's application for certificate of probable cause and stayed Ford's execution. Ford v. Wainwright, 734 F.2d 538 (11th Cir.) aff'd, --- U.S. ----, 104 S.Ct. 3498, 82 L.Ed.2d 911 (1984).
 
 
 5
 Ford contends that presently he is insane.[2] He does not contend that he was insane at the time of the murder, that he was incompetent to stand trial or that he lacked competence to pursue his initial collateral attack. He argues, however, that his mental condition has deteriorated, so that presently he is insane.
 
 
 6
 Either by statute or case law, states that authorize the death penalty uniformly prohibit the execution of presently insane persons. The origin of the rule is in the common law. Its initial justification is obscure.[3] Florida's prohibition is incorporated in Fla.Stat. Sec. 922.07 (1983), which prescribes both the test of insanity and the procedure for determining the sanity of a person under a death sentence. The test is whether the prisoner has the mental capacity to understand the nature of the death penalty and the reason it is to be imposed on him. Fla.Stat. Sec. 922.07(2) (1983). The statutory procedure requires the governor to appoint a commission of three psychiatrists and to make a determination as to the prisoner's sanity after receiving the commission's report. Ford does not challenge the state's compliance with the statutory procedure.
 
 
 7
 Ford contends that the prohibition against execution because of insanity is rooted in the eighth amendment. No federal appellate court has so held. There has, however, been considerable comment supportive of his contention.[4] Prior references in Justice Frankfurter's dissent in Solesbee v. Balkcom, 339 U.S. 9, 14, 70 S.Ct. 457, 459, 94 L.Ed. 604 (1950), and Justice Harlan's concurring opinion in Caritativo v. California, 357 U.S. 549, 550, 78 S.Ct. 1263, 2 L.Ed.2d 1531 (1958), were to the effect of due process rights on the execution of insane persons. Ford argues, however, that these opinions failed to consider the implication of the eighth amendment because they predated recognition that the eighth amendment is incorporated by the fourteenth as a limitation on the power of the states.[5] The only substantive difference between Ford's eighth amendment claim and the Florida statute is based on Frankfurter's contention in Solesbee that a defendant must be sufficiently competent to cooperate with his attorney in providing reasons why his execution should not be carried out. Since Ford has exhausted both his merits appeal and his collateral attacks, he concedes that this substantive distinction is not material in his case.
 
 
 8
 Ford argues, however, that procedural protections comporting to federal due process standards would inexorably follow from recognition of the federal constitutional basis of his substantive right. He contends that the Florida statute, which is essentially an ex parte procedure conducted by the executive, falls short of those due process standards.
 
 
 9
 If the matter were being presented for the first time, Ford's contention might present considerable difficulty. The panel majority, however, feels that Ford's contention is foreclosed by binding authority. In Solesbee the Supreme Court examined a Georgia procedure which was virtually identical to that now incorporated in the Florida statute. In the controlling portion of the opinion the Supreme Court held: "We are unable to say that it offends due process for a state to deem its Governor an 'apt and special tribunal' to pass upon a question so closely related to powers that from the beginning have been entrusted to governors." Solesbee v. Balkcom, 339 U.S. at 12, 70 S.Ct. at 458 (footnote omitted).
 
 
 10
 Ford argues that the development of eighth amendment law has so eroded the underpinnings of Solesbee that it no longer can be considered as binding authority. That contention is confronted, however, with this court's opinion in Goode v. Wainwright, 731 F.2d 1482 (11th Cir.1984), in which we considered an attack on the specific statute now in question and held: "The second claim, the attack on the Florida statute, is made on procedural due process grounds. We hold that the statute meets minimum standards required by procedural due process." Id. at 1483. The authority cited in support of that holding was Solesbee and Caritativo. Under the rule of precedent applicable in this circuit,[6] the majority regards this holding as binding. Ford contends that his facts are somewhat distinguishable from those in Goode, but the statute is precisely the same. Ford contends that the analytical underpinnings of Solesbee have been eroded but the facts are indistinguishable from those now before us. Together, our recent reliance on Solesbee and our determination that the Florida statute meets minimum standards required by procedural due process is sufficient to require that a panel of this court reject Ford's contention. If our application of Solesbee and Goode is to be altered, it must be done by the Supreme Court or at least by this court sitting en banc.
 
 
 11
 AFFIRMED.
 
 CLARK, Circuit Judge, dissenting:
 
 12
 I respectfully dissent. In the law, as in many other disciplines, where one ends up is frequently determined by where one begins. The majority fails to address and decide whether there is a constitutional prohibition against execution of an insane person. The court says that "[n]o federal appellate court has so held." Majority opinion at 4. Before addressing a party's constitutional due process rights, it is necessary to first decide the substantive constitutional right to which he is entitled, if any. Dissenting, Justice Frankfurter challenged the majority of the Court in Solesbee to reach the issue, saying:
 
 
 13
 If the Due Process Clause of the Fourteenth Amendment does not bar the State from infliction of the death sentence while such insanity persists, of course it need make no inquiry into the existence of supervening insanity. If it chooses to make any inquiry it may do so entirely on its own terms. If the Due Process Clause does limit the State's power to execute such an insane person, this Court must assert the supremacy of the Due Process Clause and prohibit its violation by a State.
 
 
 14
 The Court in an easy, quick way puts this crucial problem to one side as not before us. But in determining what procedural safeguards a State must provide, it makes all the difference in the world whether the United States Constitution places a substantive restriction on the State's power to take the life of an insane man. If not to execute is merely a benevolent withholding of the right to kill, the State may exercise its benevolence as it sees fit. But if Georgia is precluded by the Due Process Clause from executing a man who has temporarily or permanently become insane, it is not a matter of grace to assert that right on behalf of the life about to be taken. If taking life under such circumstances is forbidden by the Constitution, then it is not within the benevolent discretion of Georgia to determine how it will ascertain sanity. Georgia must afford the rudimentary safeguards for establishing the fact. If Georgia denies them she transgresses the substance of the limits that the Constitution places upon her.
 
 
 15
 Solesbee v. Balkcom, 339 U.S. 9, 15, 70 S.Ct. 457, 460, 94 L.Ed. 604 (1950) (Justice Frankfurter dissenting).
 
 
 16
 A panel of this court granted Ford's application for a certificate of probable cause and stayed his execution so that this court could fully address Ford's "substantial procedural and substantive Eighth and Fourteenth Amendment" claim of right not to be executed while insane. 734 F.2d 538. A majority of the Supreme Court refused the State of Florida's application to vacate this court's stay of execution of sentence of death and explicitly turned its decision on the issue presented by the majority opinion and this dissent. Wainwright v. Ford, --- U.S. ----, 104 S.Ct. 3498, 82 L.Ed.2d 911 (1984). Justice Powell, the writing Justice, in a footnote stated: "This Court has never determined whether the Constitution prohibits execution of a criminal defendant who currently is insane, and I imply no view as to the merits of this issue." Id. 104 S.Ct. at 3498.
 
 
 17
 Believing that it is necessary that we first resolve whether Ford has a substantive Constitutional claim, this will be considered before analyzing the due process procedural requirements. Because the majority and I have different starting points, we therefore come to different conclusions. In my view, a proper resolution of the issues in this case must begin with an inquiry into whether there is an Eighth Amendment right not to be executed while insane.
 
 
 18
 The Eighth Amendment and the Right Not to be Executed While Insane
 
 
 19
 The Supreme Court has developed a two-part standard for assessing Eighth Amendment claims. This analysis inquires whether a challenged punishment is both acceptable to contemporary standards of decency and comports with the dignity of man. Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (plurality opinion). The contemporary standards of decency test examines the constitutionality of a challenged punishment by referring to domestic public acceptance of that sanction. Woodson v. North Carolina, 428 U.S. 280, 288-301, 96 S.Ct. 2978, 2983-2989, 49 L.Ed.2d 944 (1976) (plurality opinion); Gregg, supra, 428 U.S. at 176-82, 96 S.Ct. at 2926-29. The human dignity component generally examines whether a punishment is grossly disproportionate because of the severity of the offense and/or is accompanied by the unnecessary infliction of pain. Gregg, supra, 428 U.S. at 173, 96 S.Ct. at 2925. The Court has looked primarily to objective evidence such as historical usage in the statutes of the various states to give content to the concepts of decency and dignity. See, e.g., Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion); Gregg, supra, 428 U.S. at 173, 96 S.Ct. at 2925. However, the Court has also said that it will perform an independent judicial assessment of the constitutionality of the practice in question in addition to relying on the objective evidence. For example, in Coker v. Georgia, supra, the Court stated that contemporary public attitudes towards punishing rape by death informed and confirmed its own independent judgment but did not wholly determine the controversy, for "the Constitution contemplates in the end our own judgment will be brought to bear on the question." 433 U.S. at 597, 97 S.Ct. at 2868. The Court in Coker held that the death penalty was disproportionate for the crime of rape. An application of the Supreme Court's analysis of Eighth Amendment claims to the issue in question in this case leads to the conclusion that the execution of one who is presently insane would violate the Eighth Amendment.
 
 The History of Executing of Insane
 
 20
 It has been a part of the English common law since the medieval period that the presently incompetent should not be executed. Feltham, The Common Law and the Execution of Insane Criminals, 4 Mel.U.L.Rev. 434, 466-67 (1964). See also E. Coke, Third Institute 4, 6 (London 1797) (1st ed. London 1644); 4 W. Blackstone, Commentaries 24.[1] In the United States, early commentary and decisions reflected the same attitude towards the execution of the presently insane. See, e.g., 1 F. Wharton, A Treatise on the Criminal Law Sec. 59, at 89 (8th ed. Philadelphia 1880) (1st ed. Philadelphia 1846); State v. Vann, 84 N.C. 722 (1881). State courts have continued to reaffirm the English common law rule of preventing the execution of the presently insane. See, e.g., Ex Parte Chesser, 93 Fla. 590, 594, 112 So. 87, 89 (1927); Hawie v. State, 121 Miss. 197, 216-18, 83 So. 158, 159, 160 (1919); In re Grammer, 104 Neb. 744, 746-49, 178 N.W. 624, 625-26 (1920). Therefore, the English and American common law prevented the execution of the presently insane. At present, virtually all of the states that have the death penalty have statutes that prohibit executing the insane,[2] although the procedures for enforcing the legislative mandate of the various jurisdictions varies widely. Regardless, the objective criteria both historical and present are uniform in their rejection of the penalty of death for the presently insane. Contemporary standards of decency clearly indicate the execution of an insane person would violate the Eighth Amendment.
 
 
 21
 The question of whether the execution of the insane would be in conflict with the dignity of man, the basic concept underlying the Eighth Amendment, Gregg, supra, 428 U.S. at 173, 96 S.Ct. at 2925, is closely linked to an assessment of the contemporary standards of decency. 428 U.S. at 175, 96 S.Ct. at 2926. However, an independent assessment of such a practice leads to the same conclusion. It is a basic tenet in our society that true mental illness is not a voluntary disease that can be controlled. To execute one who is insane is to extinguish the life of a person in a completely helpless condition. This person cannot truly understand what is about to happen to him, cannot assist an attorney in any viable legal issues that may still be present in his case, cannot adequately prepare for imminent death, or depending on the particular person and his religion, make his peace with God. The execution of an insane person will not further the penalogical justifications for capital sentencing, deterrence and/or retribution.
 
 
 22
 Retribution is generally perceived as "an expression of society's moral outrage." Gregg, 428 U.S. at 183, 96 S.Ct. at 2929. However, the social goal of retribution is frustrated when the power of the State is exercised against one who does not comprehend its significance. See Note, Incompetency to Stand Trial, 81 Harv.L.Rev. 454, 458-59 (1967); Musselwhite v. State, 215 Miss. 363, 60 So.2d 807 (1952).[3]
 
 
 23
 Furthermore, deterrence is not served by the execution of the mentally incompetent. Prospective offenders of capital crime would not identify with an insane person who is executed. As one commentator said: "[H]ow could the execution of a man incapable of understanding any law, operate more as a warning to others to avoid the violation of the law, than the public punishment of a dog? The one would be a spectacle of horror, the other of ridicule." Collinson, A Treatise on Law Concerning Idiots, Lunatics, and Other Persons Non Compos Mentis 472 (1812).
 
 
 24
 Therefore, a view of the historical and objective evidence as well as an independent judicial assessment of the execution of the presently insane leads to the conclusion that such an act violates both contemporary standards of decency and the basic dignity of man. Therefore, there is an Eighth Amendment right not to be executed while presently insane.
 
 
 25
 Further support for this conclusion regarding the Eighth Amendment is found in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637. The Supreme Court said that there can be no doubt that the Bill of Rights guaranteed at least the liberties and privileges that Englishmen had at the time the Bill of Rights was adopted. The Court went on to say:
 
 
 26
 When the framers of the Eighth Amendment adopted the language of the English Bill of Rights, ... one of the consistent themes of the era was that Americans had all of the rights of English subjects .... Thus, our Bill of Rights was designed in part to insure that these rights were preserved. Although the framers may have intended the Eighth Amendment to go beyond the scope of its English counterpart, their use of the language of the Bill of Rights is convincing proof that they intended to provide at least the same protection--including the right to be free from excessive punishments.
 
 
 27
 103 S.Ct. at 3007, n. 10. The framers of the Bill of Rights were familiar with the English common law. As stated earlier in this opinion, the execution of the insane was seen as cruel and unusual punishment in England at the time of the adoption of the Eighth Amendment. Therefore, even under a strict view of the Eighth Amendment, i.e. that a punishment is cruel and unusual only if it is similar to punishments considered cruel and unusual at the time the Bill of Rights was adopted, Furman v. Georgia, 408 U.S. 238, 264, 92 S.Ct. 2726, 2739, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring), the execution of the insane is prohibited. At the time the Bill of Rights was adopted, the execution of the insane was clearly perceived to be a different kind of punishment than was the execution of one who is not insane. Therefore, as a first principle, it is unequivocably established that there is a constitutional right not to be executed while insane. The question then becomes whether Florida's procedures are adequate to protect this Eighth Amendment right.
 
 
 28
 The Procedural Requirements Stemming from the Eighth
 
 
 29
 Amendment Right Not to be Executed While Insane
 
 
 30
 The State of Florida has created an administrative proceeding in which the governor determines whether an individual under sentence of death is competent to be executed. F.S.A. Sec. 922.07 (1983). That proceeding essentially provides little due process rights for the individual. When the governor is informed that a person may be insane, he must stay the execution of sentence and appoint three psychiatrists to examine the convicted person "to determine whether he understands the nature and effect of the death penalty and why it is to be imposed upon him." F.S.A. Sec. 922.07(1). The examination is to take place with all three psychiatrists present at the same time. Defense counsel and the prosecutor may be present at the examination and if the prisoner sentenced to death has no counsel the trial court shall appoint counsel to represent him. Id. However, no hearing is held and no provision is made for advocacy. The present governor has a publicly announced policy of "excluding all advocacy on the part of the condemned from the process of determining whether a person under sentence of death is insane."[4] After receiving the psychiatrists' report, the governor makes a decision. If the governor decides that the convicted person does not meet the prescribed competency test, then he orders the person committed to the state hospital. If he decides that the person is sane, then the governor issues the death warrant ordering execution. F.S.A. Sec. 922.07(2) and (3). There are no written findings and there is no judicial review of the decision. The Florida Supreme Court held in this case that "the statutory procedure is now the exclusive procedure for determining competency to be executed." Ford v. Wainwright, 451 So.2d 471, 475 (Fla.1984). The issue of sanity cannot be raised independently in the state judicial system. Id.
 
 
 31
 This procedure does not adequately protect a person's Eighth Amendment right not to be executed while insane. The fact that we are considering a federal constitutionally protected right (rather than a state created right which may be afforded some due process protections[5]) requires more process than the Florida procedure gives. Because of the qualitative difference of the death penalty, the Supreme Court has articulated a procedural component to the Eighth Amendment. In this vein, the Court has been chiefly concerned "with the procedure by which the state imposes the death sentence...." California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 3451, 77 L.Ed.2d 1171 (1983). The qualitative difference of the death penalty requires a "corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Just last term, the Court stated, "We reaffirm our commitment to the demands of reliability in decisions involving death ..." Spaziano v. Florida, --- U.S. ----, ----, 104 S.Ct. 3154, 3160, 82 L.Ed.2d 340, 349 (1984). Florida's procedures do not comport with the procedural component of the Eighth Amendment's demands for reliability.
 
 
 32
 Admittedly, we are not reviewing here the question of whether death is the appropriate punishment for Mr. Ford and the procedures used to make that decision. Nevertheless, the procedure used to determine whether the death penalty is a permissible punishment for him at this time is being reviewed. The reliability required for capital decisions is still relevant and adequate procedures to determine his present death eligibility are still required. We have not held in any case that a substantive constitutional right is adequately protected by an administrative ex parte hearing conducted by the executive branch of state government. It is the role of the courts, both state and federal, as the expositors of the dimensions of constitutional rights to make this decision. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).
 
 
 33
 A judicial hearing is required in order to provide the "adversarial debate our system recognizes as essential for the truth seeking function." Gardner v. Florida, 430 U.S. 349, 359, 97 S.Ct. 1197, 1205, 51 L.Ed.2d 393 (1977). It is a fundamental tenet of our judicial system and, therefore, our system for protecting constitutional rights, that there is "no better instrument ... for arriving at truth." Joint Anti-Fascist Refugee Commission v. McGrath, 341 U.S. 123, 171, 71 S.Ct. 624, 648, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Adversary hearings serve as an institutional check on arbitrary and impermissible action and no other procedure effectively fosters the same belief that one has been dealt with fairly even if there remains a disagreement with the result. Gray Panthers v. Schweiker, 652 F.2d 146, 162 (D.C.Cir.1980). The Florida procedure is totally lacking in due process protection. There is no room for advocacy,[6] no written findings, and no judicial review. The executive branch of state government which prosecuted the defendant makes an unreviewable decision as to whether he receives the protection of his constitutional right not to be executed if insane. Therefore, there are no protections against erroneous or arbitrary decisions as to the person's competency.
 
 
 34
 The conclusion that the Florida procedure is inadequate is supported by the Supreme Court's habeas corpus decisions. In Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Court addressed the situation of whether it was mandatory to hold an evidentiary hearing on constitutional claims presented in habeas corpus actions. The Court said: "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in his state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state court trier of fact has, after a full hearing, reliably found the relevant facts." 372 U.S. at 312, 83 S.Ct. at 756. See also Thomas v. Zant, 697 F.2d 977, 980-81 (11th Cir.1983). The Court in Townsend then set out categories of cases where a hearing must be held. These categories focus upon the reliability of the state court proceedings to vindicate the constitutional right. Townsend, supra, 372 U.S. at 313, 83 S.Ct. at 757. These categories were enacted in the federal habeas corpus statute, 28 U.S.C. Sec. 2254(d), where Congress defined the situations in which state court fact-findings are entitled to a "presumption of correctness by the federal courts." Again, the focus is on reliability. Townsend thus sets forth the threshold standards of determining whether a hearing must be held and whether Sec. 2254(d) governs the state decision. See Guice v. Fortenberry, 661 F.2d 496 (5th Cir.1981) (en banc).
 
 
 35
 Section 2254(d) assumes that there will be findings made by a state court. In this case, there was no hearing and thus no court determination. Furthermore, Sec. 2254(d)(1) provides that federal courts will not defer to state fact-finding if the merits were not resolved in the state court hearing. Subsection (2) of Sec. 2254(d) precludes giving deference to a fact-finding procedure employed by the state which was not adequate to afford a full and fair hearing. Subsection (3) of the same statutory section precludes deference if the material facts were not adequately developed at the state court hearing. Finally, subsection (6) requires that no deference be accorded if the petitioner did not receive a full, fair and adequate hearing in the state court proceeding. The facts as to Ford's sanity are in sharp dispute and have never been reached or resolved by a hearing in the state court or otherwise. As we said in our previous decision in this case, "credible evidence ... indicates that Ford is insane." Ford v. Strickland, 734 F.2d 538, 539 (11th Cir.1984).
 
 
 36
 Contrary to the holding of the majority, Ford's claims are not foreclosed by Solesbee v. Balkcom, 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604 (1950); Caritativo v. California, 357 U.S. 549, 78 S.Ct. 1263, 2 L.Ed.2d 1531 (1958); or, Goode v. Wainwright, 731 F.2d 1482 (11th Cir.1984). In none of these three cases did the Court reach a judicial determination that a person has a constitutional right not to be executed when insane. The majority opinion and this dissent concur that no federal appellate court has decided this issue.
 
 
 37
 Solesbee and Caritativo were decided before the Eighth Amendment was applied to the states through the Due Process Clause of the Fourteenth Amendment. The Eighth Amendment was incorporated in the case of Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Additionally, those two cases were decided before the Supreme Court drastically altered the constitutional framework in which a citizen in this country can be executed.[7] Therefore, they are inapplicable in deciding what the Eighth Amendment requires procedurally before a person who maintains that he is incompetent can be executed.
 
 
 38
 A certificate of probable cause was denied in Goode because "[a]ssuming that there is such a right [not to be executed when insane], we agree with the district court that petitioner is barred from raising it in this case because of abuse of the writ." Goode v. Wainwright, 731 F.2d 1482, 1483 (11th Cir.1984) (citations omitted). The denial of a certificate is a holding that the appeal is frivolous and is a decision by the court that it will not consider the case on its merits. Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).
 
 
 39
 The majority thus errs in relying upon an opinion that did not consider on their merits the issues considered herein. The decision of this court to deny Goode's certificate for probable cause was appealed to the Supreme Court which summarily refused to stay the execution. Goode v. Wainwright, --- U.S. ----, 104 S.Ct. 1721, 80 L.Ed.2d 192 (1984) (unpublished order denying certiorari). Both courts decided the case on April 4, 1984.
 
 
 40
 The present case has a different history. The panel of this court granted the certificate of probable cause on May 30, 1984, because there was no abuse of the writ. The execution was stayed to permit decision of this important issue. As stated previously, the Supreme Court refused to vacate our stay. Wainwright v. Ford, --- U.S. ----, 104 S.Ct. 3498, 82 L.Ed.2d 911, and Justice Powell noted that this issue has not been decided by the Supreme Court. Supra, 104 S.Ct. at 3498.
 
 
 41
 It is apparent that the Supreme Court considered that Goode was decided on the issue of abuse of the writ and that it was presented the issue of whether our court erred in denying the certificate of probable cause. It is just as apparent that the Supreme Court refused to vacate the May 30, 1984 stay of execution so that this court could consider the important issues of whether a person sentenced to die has the right not to be executed if he is insane, and if he has that right, whether he is entitled to a due process hearing to make the determination of this factual issue.
 
 
 42
 The district court should be reversed and the case remanded for an evidentiary hearing pursuant to 28 U.S.C. Sec. 2254(d) to determine whether Ford is insane.
 
 
 
 *
 Honorable William H. Stafford, Jr., U.S. District Judge for the Northern District of Florida, sitting by designation
 
 
 [1]
 The summary holding of abuse of the writ on the insanity issue is troublesome under the facts presented. In light of our resolution of the merits of this issue, however, it is not necessary that we reach the question
 
 
 [2]
 As a second claim for relief, Ford restates his contention that Florida administers the death penalty arbitrarily and discriminatorily on the basis of the race of the victim, the race of the defendant and other impermissible factors. With respect to this contention, we conclude that the district court's abuse of the writ holding was clearly correct. In addition, this contention fails on the merits. We do not belabor these conclusions since they have been the subject of expressions of approval by a majority of the justices of the Supreme Court. Wainwright v. Ford, --- U.S. ----, 104 S.Ct. 3498, 82 L.Ed.2d 911 (1984)
 
 
 [3]
 Justice Frankfurter and several commentators have discussed the variety of justifications offered for the common law rule. See Solesbee v. Balkcom, 339 U.S. 9, 14-19, 70 S.Ct. 457, 459-62, 94 L.Ed. 604 (1950); Hazard & Louisell, Death, the State, and the Insane: Stay of Execution, 9 U.C.L.A.L.Rev. 381, 383-89 (1962); Note, The Eighth Amendment and the Execution of the Presently Incompetent, 32 Stan.L.Rev. 765, 778-79 (1980); Note, Insanity of the Condemned, 88 Yale L.J. 533, 535-37 (1979). The most frequently discussed justifications are: (1) an insane person is incapable of assisting counsel in the fight to keep the sentence from being imposed; (2) the person's insanity is punishment enough; (3) a humanitarian mandate exists which prohibits executing insane persons; (4) the deterrence rationale would not be served by executing the insane because executing an insane individual does not serve as an example to others; (5) retribution is not had by executing the insane because killing one who is insane does not have the same moral quality as killing one who is sane; and (6) a person should not be executed while he is incapable of making peace with his maker. Id
 
 
 [4]
 See Note, The Eighth Amendment and the Execution of the Presently Incompetent, 32 Stan.L.Rev. 765 (1980); Note, Insanity of the Condemned, 88 Yale L.J. 533 (1979)
 
 
 [5]
 See Robinson v. California, 370 U.S. 660, 666-67, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962)
 
 
 [6]
 See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (1981)
 
 
 [1]
 For a more detailed analysis of the common law history, see Note, The Eighth Amendment and the Execution of the Presently Incompetent, 32 Stan.L.Rev. 765; Note, Insanity of the Condemned, 88 Yale L.J. 533 (1979)
 
 
 [2]
 Twenty-two states have enacted statutory procedures explicitly prohibiting the execution of a prisoner who has been found presently incompetent. Ala.Code Sec. 15-16-23 (1981); Ariz.Rev.Stat.Ann. Sec. 13-4021 et seq. (1982); Ark.Stat.Ann. Sec. 43-2622 (1977); Cal.Penal Code Sec. 3700 et seq. (1979); Conn.Gen.Stat. Sec. 54-101 (1980); Fla.Stats. Sec. 922.07 (1983); Ga.Code Ann. Sec. 17-10-60 et seq. (1982); Ill.Rev.Stat. ch. 38, Sec. 1005-2-3 (1982); Kan.Stat. Sec. 22-4006 (Supp.1981); Md.Ann.Code art. 27, Sec. 75 (Cum.Supp.1983); Mass.Gen.Laws Ann. ch. 279, Sec. 62 (Supp.1984); Miss.Code Ann. Sec. 99-19-57 (Supp.1983); Mo.Rev.Stat. Sec. 552.060 (Supp.1983); Mont.Code Ann. Sec. 46-19-201 et seq. (1983); Neb.Rev.Stat. Sec. 29-2537 et seq. (1979); Nev.Rev.Stat. Sec. 176.425 et seq. (1983); N.M.Stat.Ann. Sec. 31-14-4 et seq. (1978); N.Y.Correc.Law Sec. 655 et seq. (Supp.1983); Ohio Rev.Code Ann. Sec. 2949.28 et seq. (Supp.1982); Okla.Stat.Ann. title 22, Sec. 1004 et seq. (1983); Utah Code Ann. Sec. 77-19-13 (1982); Wyo.Stat. Sec. 7-13-901 et seq. (Cum.Supp.1984)
 Five states which authorize capital punishment have adopted statutes requiring the transfer of any mentally disordered prisoner to a state mental hospital. See 11 Del.Code Ann. Sec. 406 (1982); Ind.Code Ann. Sec. 11-10-4-1 et seq. (1983); N.C.Gen.Stat. Sec. 15A-1001 (1983); S.C.Code Ann. Sec. 44-23-210 et seq. (Supp.1983); Va.Code Sec. 19.2-177 (1983).
 Except in cases involving a woman supposedly pregnant, only the governor can reprieve a death sentence in Idaho. Idaho Code Sec. 19-2708 (1979). But Idaho adopts the common law absent a specific statutory provision, id. Sec. 73-116 (1973), and the common law prohibits the execution of the presently incompetent. Therefore, the Idaho statute should apply for the presently incompetent.
 Four states have statutes that grant the governor, or some other authority discretion to stay the execution of the presently incompetent. See Ark.Stat.Ann. Sec. 43-2622 (1977); Ga.Code Ann. Sec. 27-2602 (1978); Mass.Ann.Laws ch. 279, Sec. 48 (Michie/Law.Co-op 1963); N.H.Rev.Stat.Ann. Sec. 4-24 (1970).
 Four states have adopted, by case law, the common law rule prohibiting the execution of the presently incompetent. State v. Allen, 204 La. 513, 516, 15 So.2d 870, 871 (1943); Commonwealth v. Moon, 383 Pa. 18, 22-23, 117 A.2d 96, 99, 100 (1955); Jordan v. State, 124 Tenn. 81, 90-91, 135 S.W. 327, 329-30 (1911); State v. Davis, 6 Wash.2d 696, 717, 108 P.2d 641, 651 (1940) (dictum).
 
 
 [3]
 "Amid the darken midst of mental collapse, there is no light against which the shadows of death may be cast. It is revealed that if you were taken to the electric chair, he would not quail or take account of its significance." Id. 60 So.2d at 809. See also Note, Insanity of the Condemned, 88 Yale L.J. 533, 536 n. 17 (1979) (execution of the presently insane is executing a person who for all moral purposes is not the same person who committed the crime)
 
 
 [4]
 Goode v. Wainwright, 448 So.2d 999 (Fla.1984)
 
 
 [5]
 See discussion, supra, pages 528-529
 
 
 [6]
 The petitioner cannot call witnesses, cross-examine the doctors who render the decision, or present argument on his behalf
 
 
 [7]
 See Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), as well as the above discussion. At the time Solesbee and Caritativo were decided, there was nothing constitutionally impermissible with "committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases." McGautha v. California, 402 U.S. 183, 207, 91 S.Ct. 1454, 1467, 28 L.Ed.2d 711 (1971). McGautha, like Solesbee and Caritativo, was decided on the basis of the Fourteenth Amendment and not on Eighth Amendment grounds. In Furman and Gregg, the Court recognized and began to explicate the Eighth Amendment parameters of capital sentencing